**Charles SLOAN, Appellant,**

v.

**STATE of Tennessee, Appellee.**

Court of Criminal Appeals of Tennessee.

Nov. 28, 1978.

Certiorari Denied by Supreme Court July 2, 1979.

Charles R. Ray, Barrett, Lenahan, Kniffen & Ray, P. C., Nashville, for appellant.

Brooks McLemore, Jr., Atty. Gen., William O. Kelly, Asst. Atty. Gen., Elmer Davies, Dist. Atty. Gen., Franklin, for appellee.

FRANK F. DROWOTA, III, Special Judge.

## OPINION

The main issues in this case of armed robbery center around alleged suggestiveness in the procedures used in the identification of the defendant, Charles Sloan. We find that the identification procedures were so suggestive that they gave rise to a very substantial likelihood of irreparable misidentification, that the in-court identification should therefore have been excluded, and that there was no other evidence sufficient to convict defendant; and on this basis we hold that defendant's conviction should be reversed.

Defendant Charles Sloan's trial and conviction arose out of an indictment presented by the Williamson County Grand Jury in September of 1975, charging defendant with the armed robbery of the Goose Creek Inn on May 30, 1975, in which $1,475.00 was taken. The trial began on September 17, 1977, after a two year period during which several continuances were requested by and granted both the State and defendant. On September 20, 1977, defendant was found guilty of the offense of armed robbery and sentenced to ten years in the Tennessee State Penitentiary. In October, 1977, defendant moved for a new trial and on December 8, 1977, an order overruling the motion and granting an appeal was filed. Pursuant to this order defendant filed his bill of exceptions and appealed his conviction to this Court.

## FACTS

The robbery for which defendant was convicted occurred in the early morning hours of May 30, 1975. Mrs. Evelyn Bullard and Mr. Tom Wagner were at work in the Goose Creek Inn front office when two men entered, ostensibly to take a room. One of the men, not the one alleged to be the defendant, had come in earlier and asked about prices. While the other man was apparently filling out the information card for a room, the man alleged to be the defendant pulled a gun and one or the other of the men informed Mr. Wagner and Mrs. Bullard that they "wanted their [the Inn's] money." There is some discrepancy in the testimony of the two victims as to what happened next, whether the robbers first took the money from the cash register or just asked about a safe, only to be told there was none. In any event, shortly after entering the Inn, the two men went with the victims into the back room where they tied the victims up on the floor and took some money from a locked desk drawer which they forced open. The total time the robbers were in the Inn was about 10 to 20 minutes, according to the victims' testimony. Mrs. Bullard testified that the man alleged to be the defendant did most of the talking; Mr. Wagner testified that the oth-er man talked most, that the man with the gun talked "hardly at all." There were several other inconsistencies in the victims' accounts of the incident. It should be noted that Mrs. Bullard testified for the State, Mr. Wagner for the defense.

After the robbers left, Mrs. Bullard got herself free and called the Williamson County Sheriff's office and the manager of the Inn. Mr. Fleming Williams, who was Sheriff at the time of the robbery, testified that Mrs. Bullard's call came at a little before 2:00 a. m. This testimony, along with that of the two victims, puts the time of the robbery at approximately 1:30–1:45 a. m. When the Sheriff arrived, Mr. Wagner was upset; there is some difference between the testimony of Sheriff Williams and Deputy Donald Robinson, a defense witness, as to whether Mrs. Bullard was also upset. The Sheriff described her as calm; Deputy Robinson said she was no less frightened and nervous than was Mr. Wagner. According to Mr. Wagner's testimony, Mrs. Bullard broke down and cried after it was all over. Mrs. Bullard denied this.

Both Mrs. Bullard and Mr. Wagner gave fairly complete descriptions of the two men to the Sheriff. The man alleged to be the defendant was described by Mr. Wagner as being "a white male, 5'10" or 5'11", 160–165 lbs., late teens or early twenties, long medium dark hair below ears and above shoulders, greasy or slick looking, blue jean pants," and as not having a southern accent. Mrs. Bullard described him as being "5'8" to 5'9", 135–140 lbs., 17 to 20 years old, light brown hair, thin-type hair, hair receded slightly, hair approximately down to bottom of ears, big round eyes, oval type face, southern talk, sport shirt, long sleeves." She later testified that he was taller than she and did not wear glasses.

Sheriff Williams conducted an investigation, in the course of which he learned that a young man who subsequently turned out to be Charles Sloan was at the Hagermon Truck Stop, across Interstate 65 from the Goose Creek Inn, the night of the robbery. At trial Larry Martin, a truck stop attend-

ant, testifying for the defense, said that Sloan had come into the truck stop sometime between 1:30 and 2:00 a. m. the morning of May 30, 1975, gotten gasoline for his car, spent 15 to 20 minutes browsing in the gift shop at the truck stop, and then left without paying for the gasoline. Martin described Sloan's appearance at that time as being "5'6" to 5'7", 140 lbs., brown hair over his ears," and as wearing blue jeans and a red shirt like a football jersey with his name across the back of it. He said that Sloan was alone in the truck stop. He also said that Sloan wore glasses.

Sheriff Williams located Sloan by tracing his license plate number, which one of the attendants had copied as he left the truck stop. On the afternoon of May 31st, the day after the robbery, Sheriff Williams and a Lt. Easley visited the Sloan home and found only defendant's mother at home. After talking with the very frightened Mrs. Sloan, the two officers left with a photograph of Charles Sloan. The trial court later suppressed this photograph as being illegally seized, because Mrs. Sloan did not give her permission for the officers to take it, that she was rather frightened into merely submitting to their taking of it.

On the evening of May 31, Sheriff Williams again interviewed Mrs. Bullard, and showed her an array of seven photographs, six mugshots and the photograph of defendant Sloan, which is best described as a professionally-taken color portrait of Sloan in a Navy uniform. Mrs. Bullard picked Sloan's picture and one of the mugshots as having certain facial features like the robber who had the gun. She told the Sheriff during this interview that the man with the gun had protruding teeth.

Two days later, at a lineup in which Sloan voluntarily participated, Mrs. Bullard identified Sloan as being the robber with the gun. She admitted, at a hearing held May 21, 1976, on defendant's motions to suppress the photograph, lineup, and any in-court identifications, that she said "something like" the words: "number four looks more like him than any of the others." At trial, the Sheriff testified that she said "number

four looks like the one" or "just like the one." After this, according to both the Sheriff's and Mrs. Bullard's testimony at trial, the Sheriff told her that Sloan had been in the area the night of the crime. Defendant alleges that only after hearing this statement did Mrs. Bullard become definite in her identification. At trial, Mrs. Bullard was insistent that she was positive from the start in her identification. Mr. Wagner, who had not seen the photographic array, could not identify anyone in the lineup. Sloan was the only one from the array of photographs, and the only one with protruding teeth, in the lineup.

At trial, no other evidence besides Mrs. Bullard's eyewitness identification connected Sloan to the robbery. No gun or money was ever found; neither was anyone alleged to be the other robber ever found. The prosecution's only witnesses were the Goose Creek Inn's accountant, who testified as to the amount of money taken in the robbery; the Sheriff; and Mrs. Bullard. The defendant called as witnesses Larry Martin, from the truck stop; Tom Wagner, the other victim; Deputy Donald Robinson; defendant's father Walter Sloan; and two character witnesses, a neighbor and defendant's former employer.

A part of the testimony that is of interest to the Court, although it is not at issue in this case, involves the motivation of the Sheriff in the prosecution of the defendant. Walter Sloan testified that, while his son was voluntarily having himself fingerprinted at the jail, he (Walter Sloan) asked the Sheriff whether he really thought he had the right man, to which Sheriff Williams responded: "your son is the only suspect that I have and I intend to send somebody to the penitentiary." Sheriff Williams in his testimony denied saying anything like this.

The fact that defendant Sloan was at the truck stop the night of the crime the State attempted in its closing argument to present as corroboration of the eyewitness evidence. The State's theory was that the time periods testified to by the various witnesses were vague enough to have allowed

Sloan to wait at the truck stop until the other man "cased the joint" across the highway at the Inn. Defendant on the other hand attempted to use Sloan's being at the truck stop at approximately the same time the robbery took place as an alibi, emphasizing as well the fact that Sloan had on a red jersey with his name on it while at the truck stop. Defendant suggests in one assignment of error that had the trial taken place earlier than two years after the crime, defendant's alibi would have been stronger; that the memories of the witnesses at the truck stop had faded by the time of the trial.

Before trial, defendant moved that the photograph of him in his Navy uniform be suppressed because it was illegally seized, and that the lineup identification and any in-court identification based on the illegally seized photograph be suppressed as the "fruits of the poisonous tree." He also moved that any in-court identification of him be suppressed as being fatally affected by the photographic identification procedure which was so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification.

The trial court suppressed the photograph as being illegally seized, but refused to suppress the lineup identification. By implication, the trial court considered the arguments on the fruit of the poisonous tree and the suggestiveness of the identification procedures to be without merit.

## ASSIGNMENTS OF ERROR

Defendant has filed eleven assignments of error. In the one we think is his strongest, he contends that the pre-trial identification procedures used with the eyewitness, Mrs. Bullard, were so suggestive that the admission of her in-court identification denied him due process of law. Defendant also assigns as error the refusal of the trial court to suppress the lineup and in-court identifications as the "fruit of the poisonous tree" of an illegally seized photograph of defendant which the trial court did suppress. Defendant claims in another assignment that, in order to show the suggestive-

ness of the identification procedure, he would have had to waive his Fourth Amendment right to have the illegally seized photograph suppressed, and that being so forced to choose between his Fourth and Fifth Amendment rights is reversible error. In yet another, defendant asks this Court to adopt a new evidentiary rule which would demand corroboration in cases where the eyewitness was not previously acquainted with the defendant and where the identification procedures were unduly suggestive. We think these assignments merit discussion, and as we have indicated, we find that the first compels a reversal of defendant's conviction.

■ Defendant's other assignments of error and our findings regarding them are as follows: That defendant was denied a speedy trial is an argument without merit in this case because defendant was responsible for much of the delay. Even though defendant moved to dismiss on the basis of a denial of speedy trial in May of 1976, five months after the original trial date, we note that defendant's counsel requested two of the five continuances granted in this case which accounted for approximately twelve months of the total twenty-one month delay from the date for which trial was originally set (December 19, 1975) until the date trial actually commenced (September 17, 1977).

■ We find defendant's assignment that the trial court erred in not charging the jury with a requested instruction regarding eyewitness identifications to be harmless error.

■ We find that the trial court's over-ruling defendant's motion for a mistrial when the State interjected proof of other crimes to have been harmless error and in any event to have been cured by the court's instruction to the jury to disregard that evidence.

We find no merit in defendant's assignments regarding the State's allegedly prejudicial and not bona fide redirect testimony, the witness having been seated at counsel table, the State's allegedly inflammatory rebuttal argument, and the failure to in-

clude a charge on attempt to commit armed robbery.

## I.

Let us first consider defendant's argument that the identification procedures used in this case were so suggestive that he was denied due process of law. This court has recognized that

[a] violation of due process . . . may occur in a suggestive identification procedure even in the earliest stages of a criminal investigation. In deciding whether or not there has been a violation, the court must view the "totality of the circumstances." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Due process has been violated if the court finds that the identification procedure was so suggestive as to give rise to "a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Such a finding would require exclusion of a subsequent in-court identification by the same witness. . . .

In [*Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)] the U.S. Supreme Court described in detail the approach to be taken in measuring out-of-court identification procedures against due process requirements. The Court set out five factors to be considered in determining whether an identification is reliable enough to withstand a due process attack despite suggestiveness in the procedure employed. These factors are the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty of the witness at the confrontation, and the length of time between the crime and the confrontation. The degree of reliability in the identification itself, as indicated by these factors, is to be assessed in light of the suggestiveness of the identification procedure and the totality of the circumstances to determine whether a violation of due process has occurred.

*Proctor v. State*, 565 S.W.2d 909, 911–912 (Tenn.Cr.App.1978).

The United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977), reaffirmed the *Simmons-Stovall-Neil* approach, noting that "reliability is the linchpin."

In the case before us the last of the *Neil* factors can be dealt with quite simply, as the photographic identification took place a day and a half after the crime, the lineup two days after that. How the other four factors apply to this case is not so easily determined. There are differences in the testimony of the two victims as to how long a period they had to view the robbers and how well they could actually see them; for at least part of the time they were tied up on the floor with little if any view at all of the two men. Regarding the witness's degree of attention, there are also discrepancies, alluded to above, among the testimony of the victims, the Sheriff, and Deputy Robinson as to how calm or upset Mrs. Bullard was. She herself admitted at trial during cross-examination that she had been upset and that she had tried to "purge" the event from her mind.

Defendant and the State disagree as to the accuracy of Mrs. Bullard's prior description of the robber. Defendant Sloan was apparently not so heavy at the time of the crime as Mrs. Bullard's description portrayed the robber; Mrs. Bullard also testified that the robber was taller than she, though in actuality defendant Sloan is the same height she is. The State argues that the differences in Mrs. Bullard's description and an accurate description of Sloan at the time of the robbery are not great. Defendant on the other hand makes a great deal of the fact that Mrs. Bullard never explained the height discrepancy. Defendant also emphasizes that Mrs. Bullard's description of the robber was different from Mr. Wagner's and Larry Martin's.

The *Neil* factor which presents the most difficulty in this case is the level of certainty of Mrs. Bullard at the confrontation. It

seems very likely that her level of certainty increased because of certain elements of the procedures alleged to be suggestive. While she did not specifically identify anyone in the photographic array, she did pick out defendant's photograph (and one other) as having certain features like one of the robbers. The evidence is unclear as to her level of certainty at the lineup. While at trial she testified that she was "humanly certain" of her identification of Sloan at the lineup, her testimony at trial differed in some important respects from her testimony at the hearing on the motion to suppress, held more than a year earlier. These discrepancies are discussed above, in the "Facts" Section of this opinion. She seemed far more certain at trial, even though trial was held over two years after the lineup. We do not doubt her sincere belief in her certainty; such sincere belief, however, is no guarantee that she was not influenced in subtle ways by suggestive elements in the identification procedures which took place so long before.

It is evident that there are varying levels of doubt as to the reliability of the identification procedures in question under four of the five *Neil* factors. We must now assess this doubtful degree of reliability in light of the suggestiveness of the identification procedures and the totality of the circumstances to determine whether a violation of due process occurred.

■ There were questionable elements in both the photographic and the lineup identification procedures. Defendant asserts that the photographic identification procedure was suggestive in that the photograph of defendant was emphasized by the fact that it was a portrait of him in a Navy uniform, and the other photographs were mugshots. The fact that a photograph is "in some way emphasized" may indicate that the identification procedure is improperly suggestive. *Simmons, supra* 390 U.S. at 383, 88 S.Ct. 967.

Defendant further submits that Sheriff Williams' statement to Mrs. Bullard at the lineup that Sloan had been in the area the night of the crime made the lineup identification procedure suggestive. Defendant's theory is that the suggestive photographic identification procedure put his face in Mrs. Bullard's mind and led to Mrs. Bullard's tentative identification of him at the lineup; that the Sheriff's statement at the lineup bolstered her tentative identification and made it a positive one; and that the in-court identification was so fatally affected by these elements of suggestiveness that its admission into evidence denied him due process of law.

The United States Supreme Court in *Simmons* pointed out that "[r]egardless of how the original misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons, supra* at 384, 88 S.Ct. at 971. The court has also noted, in *United States v. Wade*, 388 U.S. 218, 228–229, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that

[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances . ."
. . . A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to the witnesses for pretrial identification. A commentator has observed that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined." . . . Suggestion can be created intentionally and unintentionally in many subtle ways. . . .

Moreover, it is a matter of common experience that, once the witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.

Were we dealing in this case with a situation where either the photographic identification *or* the lineup identification had some element of suggestiveness, and the other were free of it, we would not be so troubled by this case. Here, however, *both* of the *only two* pre-trial identification procedures arguably have serious elements of suggestiveness, and only one of the two eyewitnesses to the crime has identified the defendant.

Moreover, the State produced no definitive evidence at trial to corroborate the eyewitness testimony of Mrs. Bullard. The Sheriff testified that he had received information which through further investigation led to the fact that defendant was at a truck stop near the Goose Creek Inn the night of the robbery. The State did not present as a witness any employee of the truck stop. It did attempt during cross-examination of defense witness Larry Martin to get Martin to admit that he could have been wrong in testifying that Sloan came in at 1:30 and stayed 15 to 20 minutes. Martin conceded that he "couldn't swear" after two years as to the exact times, but stuck to his former testimony. The State in closing argument proposed its theory of Sloan waiting at the truck stop while the other robber "cased the joint," but offered no hard proof of this; indeed, the evidence as to the time factor seems clearly to contradict this theory. Defendant never denied being at the truck stop; he rather used his presence there as an alibi. He claims that he could not have been at the truck stop at 1:30 a. m. on May 30, 1975, wearing a red jersey *with his name on it* and also have been robbing the Goose Creek Inn in a "sport shirt."

A comparison of this case with others involving the issue of suggestive identification compels our conclusion that defendant's conviction must be reversed, because the likelihood of irreparable misidentification in his case was clearly "very substantial," and there was no evidence upon which to convict him apart from the eyewitness identification of Mrs. Bullard.

*Stovall* and *Neil* both involved what is called a "show-up," in which the suspect is shown to the witness alone rather than in a group or lineup. In both, the court upheld the procedure. In *Stovall*, however, the court stressed the necessity of the procedure used: the only witness to a murder was in the hospital and in danger of dying at any moment; the only reasonable way to get an identification was to bring the accused to the hospital room. *Stovall, supra,* 388 U.S. at 302, 87 S.Ct. 1967. In *Stovall*, there was also corroborating physical evidence—a shirt and keys belonging to the accused were found at the scene of the crime. *Stovall, supra* at 295, 87 S.Ct. 1967.

*Neil* was a rape case; the court pointed out that the victim "was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil, supra,* 409 U.S. at 201, 93 S.Ct. at 382–383. In that case, the victim had also made no previous identification at any of several showups, lineups and photographic showings.

*Banks v. State,* 556 S.W.2d 88 (Tenn.Cr. App.1977) and *Forbes v. State,* 559 S.W.2d 318 (Tenn.1977) were also rape cases. In *Banks,* the court found that the *Neil* 5-factor test was met and did not go into the suggestive elements of the lineup. In *Forbes,* the victim identified her assailant at a hospital where he was a patient rather than at a proper lineup, but this procedure was held to be otherwise nonsuggestive and necessary under the circumstances.

In *Simmons,* photographic identifications were upheld. However, several witnesses identified that defendant, and there was no evidence that the photographs of the defendant were in any way emphasized, unlike in the instant case.

In *Bennett v. State*, 530 S.W.2d 511 (Tenn.1975) suggestive identification procedures similar to those in this case were upheld, but there was "substantial other testimony to validate the identification of the defendant." *Bennett, supra*, at 515. In *Bennett*, defendant was accused of armed robbery and rape. The crimes occurred in a motel room. One week after the crime, the defendant was found attempting to enter an adjoining room armed with a pistol of the same caliber used to inflict a wound in the earlier crime.

The allegedly suggestive identification in *Rippy v. State*, 550 S.W.2d 636 (Tenn.1977), a murder case, took place not at the initiation of the police or the prosecutor, but rather was requested by the surviving victim to "ease his mind" and played no part in the prosecution.

In *Manson v. Brathwaite*, supra, the individual who identified the defendant by viewing a single photograph was a policeman, a "trained observer" who had given a detailed description of the defendant; there was no claim the physical characteristics of the defendant did not coincide with the observer's description.

There was some indication that the defendant's photograph was emphasized in a photographic showing (he was the only one with gray hair and was wearing a parka) and that the identification procedure was therefore suggestive in *Saville v. U. S.*, 400 F.2d 397 (1st Cir. 1968), cert. den. 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 768 (1968). However, the suggestive identification was corroborated by that of other witnesses, there was other testimony on the defendant's knowledge and intent, and there was nothing in that case "to suggest that the verdict of guilty . . . was in any way induced by the evidence [based on the suggestive identification.]" Had the verdict depended on this evidence, two of the three judges who heard the case suggested in a concurring opinion that they might not have affirmed the conviction under the *Simmons* test. *Saville, supra* at 399–400.

The court in *United States v. Trivette*, 284 F.Supp. 720 (D.C.D.C.1968) granted defendant's motion to suppress a witness's in-court identification because the identification procedure, involving the showing of slides accompanied by suggestive comments by police, was impermissibly suggestive. The witness in *Trivette*, while observing the slides of different people, among whom was the suspect, "shrank" as one slide appeared. The policeman showing the slides asked, "Is that the man?" and the witness replied that it was. The policeman then told her that the man she identified had also been identified by another witness. Later, the defendant was brought alone, in the custody of a policeman, through a room in which the witness was sitting and she again identified him; no lineup was held. The court held that there was "substantial doubt as to the validity of the identification process" because of the combination of the suggestive elements in the two identifications, that the show-up therefore deprived the defendant of due process of law, and that any in-court identification based on that show-up must be suppressed. *Trivette, supra* at 722.

The *Trivette* case illustrates the somewhat complicated and confusing nature of the whole issue of suggestive identification. For the court there seemed to be saying that if the State could show that the identification had an independent origin, i. e. if the witness could have identified the defendant in court solely on the basis of her viewing of him at the time of the crime, without the benefit of the photographic identification or the show-up, then the in-court identification should have been allowed. The court found however, that even a full lineup with counsel at that point could not have provided such a showing of independent origin, because the suggestiveness of the procedures already used was so great, and because the witness herself was hesitant in saying she could have identified the defendant in court without benefit of those procedures.

The *Trivette* court essentially confuses *Wade, supra*, which dealt with the "fruit of the poisonous tree" doctrine, and *Simmons*, which test has been set out above, but purports to be basing its holding solely on

*Simmons.* The use of the words "likelihood of *irreparable* misidentification" by the court in *Simmons* indicates that there is no way that a possible pre-trial misidentification once made, which meets the test the court set out, can be repaired, or that it can possibly be of independent origin.

Thus the *Trivette* court adds an unnecessary step to the *Simmons* test. Defendant as well (to his own possible detriment) confuses the analysis of *Wade, supra* and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) with the *Stovall-Simmons-Neil-Manson* analysis. *Wade* and *Gilbert* had to do with lineup identifications which were constitutionally unsound because of the lack of counsel; in-court identifications based on such lineup identifications are not admissible if tainted under *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). (This test is set out below in Section II.) In-court identifications which are of independent origin are not so tainted under this analysis.

■ The *Stovall-Simmons-Neil-Manson* test has been set out above and refers to identifications which may deny due process because of their suggestiveness. Once the test has been met, there is no question as to independent origin of the in-court identification—it is automatically excluded.

■ Defendant's case is easily distinguishable from cases in which allegedly suggestive identification procedures were upheld: in his case the suggestive elements were not made necessary to any special circumstances, nor was there any corroboration of the eyewitness identification; his is not a rape case with its very special circumstances. Viewing the totality of the circumstances in this case, we find that the identification procedures used were so suggestive that they gave rise to a very substantial likelihood of irreparable misidentification. Thus the *Stovall-Simmons-Neil-Manson* test has been met and we must find that the in-court identification of Sloan by Mrs. Bullard should have been excluded. Since there was no other evidence sufficient to convict defendant, this is a sound basis for a reversal.

We wish to emphasize that we in no way intend to imply any purposeful wrongdoing on the part of the police in this case. As the court in *Wade* commented, "We do not assume that these risks [of misidentification and resultant miscarriage of justice] are the result of police procedures intentionally designed to prejudice an accused. Rather we assume they derive from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of pretrial identification." *Wade, supra,* 388 U.S. at 235, 87 S.Ct. at 1936.

It is because of these dangers that police departments must be especially careful in cases of this sort. Increased attention to such matters should not hamper the police in their task of bringing criminals to justice; rather it should improve their level of efficiency in accomplishing this goal.

## II.

Defendant alternatively argues that the lineup and in-court identifications should have been suppressed as the "fruit of the poisonous tree" of the illegally seized photograph. He alleges that the illegally seized photograph led to the partial identification of him by Mrs. Bullard, which in turn led to the lineup identification.

In *Wade* the lineup identification was held to be illegal because of the absence of counsel. The court held that the proper test to use to determine whether the in-court identification was admissible was that set out in *Wong Sun*: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wade, supra* at 241, 87 S.Ct. at 1989. (*Wong Sun, supra* 371 U.S. at 488, 83 S.Ct. 407.) In *Wade,* the court vacated the conviction "pending a hearing to determine whether the in-court identifications had an independent source, or whether, in any event, the introduction of the evidence was harmless error . . . and for the District Court to reinstate the conviction or

order a new trial." *Wade, supra* 388 U.S. at 241–242, 87 S.Ct. at 1940.

In defendant's case, the illegality analogous to the lineup held without counsel in *Wade* was the wrongful seizure of his photograph. The hearing on defendant's motion to suppress the photograph included arguments and evidence on whether the lineup identification arose out of the photographic identification. The judge held by implication that it did not. We doubt, however, that the Sheriff would have held the lineup if Mrs. Bullard had not picked out the photograph of Sloan as being similar in certain characteristics to one of the robbers. At the aforementioned hearing, this question was not put directly to the Sheriff. Defendant's attorney did ask him if Mrs. Bullard had identified Sloan as a possible suspect, to which he responded negatively. Mrs. Bullard, however, later in the hearing, admitted that she had picked defendant's photograph and one other as having certain features (mouth and teeth in defendant's case) like one of the robbers. She claimed that having seen the photograph of defendant had no effect on her identification of him in the lineup.

■ Again, we do not doubt Mrs. Bullard's veracity. But we recall Justice Harlan's statement in *Simmons, supra* that once a witness has seen a photograph, that image, rather than that of the person actually seen, is apt to be retained in the mind, thus "reducing the trustworthiness of subsequent lineup or courtroom identification." Keeping in mind this admonition, together with the likelihood that the Sheriff would not have held a lineup had defendant's photograph been totally ignored by Mrs. Bullard, and the fact that the photograph was suggestively emphasized by its being the only one that was not a mugshot, we find it highly improbable that the lineup and courtroom identifications were come at by means "sufficiently distinguishable to be purged of the primary taint." We think defendant's argument that the lineup and courtroom identifications of him by Mrs. Bullard were the "fruits of the poisonous tree" and should have been suppressed has merit.

## III.

In *Manson,* the Supreme Court stated that if the identification procedures are not held under the "totality of the circumstances" test to be so suggestive as to deny due process of law, then the jury must weigh the evidence on the suggestiveness of the evidence. *Manson, supra* 97 S.Ct. at 2254. The court in *Simmons* had also pointed out that the dangers of photographic identification procedures, i. e. convictions based on misidentifications, may be "substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Simmons, supra* 390 U.S. at 384, 88 S.Ct. at 971. In this case, even though the possible suggestiveness of the lineup procedure, including the Sheriff's comment, was exposed to the jury, that of the photographic identification was not, as it was suppressed as being illegally seized.

Defendant assigns as error the fact that, to prove to the jury the suggestive nature of the whole identification procedure, he would have had to waive his Fourth Amendment right to have the photograph excluded. He bases this assignment on the holding in *Simmons* that the defendant in that case should not have been forced to choose between two constitutional rights. In *Simmons,* the issue was whether or not that defendant's testimony in support of a motion to suppress evidence might be used to incriminate him later. The court held that it could not be so used, that "In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons, supra* at 394, 88 S.Ct. at 976.

Whether or not we deem it wise of defendant not to waive his Fourth Amendment right and thus make an effort to prove to the jury that the identification procedures were suggestive, it is clear that he would have had to so waive this right to prove his point, and in this sense, he was forced to choose between his Fourth Amendment right to be free from illegal seizure and his Fifth Amendment right to

due process of law. The validity of a reversal on this point need not, of course, be considered, because of our finding that the identification procedures used in this case were so suggestive that they constituted a violation of defendant's right to due process of law.

## IV.

In another assignment of error, having to do with suggestive identification, defendant proposes to this Court a new evidentiary rule which would require independent corroborating evidence in cases where the eyewitness was not previously acquainted with the accused, and the identification is tainted by undue suggestiveness. (He is unclear, however, as to what would constitute "undue suggestiveness.")

Defendant draws an analogy to the rule that requires independent corroboration of accomplices' testimony. The State points out that the accomplice rule exists because of the motivation an accomplice may have to be less than truthful and to try to incriminate another to escape punishment himself. A non-accomplice eyewitness is not subject, the State argues, to the same lack of reliability.

While it is true that an eyewitness may not be motivated to be untruthful, there are serious dangers of miscarriage of justice in cases where defendants are convicted solely on one eyewitness's testimony. As we have seen, the United States Supreme Court has recognized these dangers. An eyewitness may well believe that he or she has correctly identified an accused as the perpetrator of a crime, *and be wrong*. This is more likely to happen where the eyewitness was not previously acquainted with the defendant and where there has been some element of suggestiveness in the identification procedure(s).

■ This Court nevertheless believes that conscientious and consistent application of the *Stovall-Simmons-Neil-Manson* test for suggestive identification set out in part I above is adequate protection against these dangers, the gravity of which we well recognize.

## CONCLUSION

We find that the procedures used in the identification of defendant Charles Sloan were so suggestive that they gave rise to a very substantial likelihood of irreparable misidentification and that the in-court identification of him by Mrs. Evelyn Bullard should have therefore been excluded. Since there was no other evidence upon which defendant could have been convicted, we hold that his conviction is reversed.

■ When a reversal is on the basis of insufficient evidence to support a verdict, the reviewing court must direct a judgment of acquittal, rather than order a new trial. Otherwise, the Double Jeopardy Clause of the United States Constitution would be violated. This was the holding of the United States Supreme Court in *Burks v. U. S.,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15, decided the same day, the court held that this principle applies to state criminal proceedings.

■ Our reversal of defendant's conviction is clearly based on insufficient evidence to support a verdict, and we therefore remand this cause to the Williamson County Criminal Court for entry of a judgment of acquittal. Costs incurred on appeal are assessed against the State.

BYERS, J., concurs.

GALBREATH, J., did not participate.