# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 15, 2009 Session

## STATE OF TENNESSEE v. ANDREI CIOBANU

**Appeal from the Criminal Court for Knox County**
**No. 87612      Mary Beth Leibowitz, Judge**

---

### No. E2009-00580-CCA-R3-CD - July 2, 2010

---

The Defendant, Andrei Ciobanu, was charged with vandalism of property with a value of at least $1,000 but less than $10,000. See T.C.A. § 39-14-408. The trial court granted his motion to suppress eyewitness identification evidence and dismissed the case. In this appeal filed by the State, we reverse the order of the trial court suppressing the evidence and dismissing the case.

**Tenn. R. App. P. 3 Appeal as of Right; Order of the Criminal Court Reversed; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and C. Lewis Walton, III, Assistant District Attorney General, for the appellant, State of Tennessee.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellee, Andrei Ciobanu.

### OPINION

This case arises from the vandalism of Nathan Roberts' Acura Integtra in the parking lot of the Electric Cowboy nightclub. There were several eyewitnesses to the incident, but only Christopher McKinney was able to identify the Defendant from a photograph lineup. Before trial, the Defendant moved to suppress Mr. McKinney's identification.

At the suppression hearing, Chad Schwartz testified that he was employed by the Knox County Sheriff's Department as a support services technician. He said that Deputy Lee

Strzelecki requested that he prepare two photograph lineups, with one containing the Defendant's photograph and one containing the photograph of Viorel Ciobanu. He said that he selected the other photographs used in the lineups by computer from driver's license records using the following criteria: age between eighteen and thirty, white, male, and brown hair. He then visually inspected the matches and chose photographs for the lineups which bore the greatest similarity to the suspects. He said that he varied the order of the suspects' photographs within the lineups using a computer randomization function. He said he gave Deputy Strzelecki a total of fourteen photographs, with two being six-photograph composite lineups, and the other twelve being individual photographs of each person in the lineups. He acknowledged that the photographs appeared in color on his computer but that the prints he gave Deputy Strzelecki were black and white. He said that the Sheriff's Department was unable to print driver's license photographs in color. He acknowledged that features such as scars and skin tone were not distinguishable in black and white photographs.

Knox County Sheriff's Deputy Lee Strzelecki testified that nine days before the vandalism that is the subject of this case, he was off duty and saw an attempted burglary in progress at Racing Innovations. He said that the suspect, Gregor Ciobanu, fled the scene but was captured and arrested. He said that during the arrest, several people, one of whom was the Defendant, arrived and began behaving aggressively toward the arresting officers. He said he was unsure whether Viorel Ciobanu, whom he identified as the Defendant's brother, was among the people who harassed the officers. He said that when he was patrolling near Racing Innovations nine days later, the owner of Racing Innovations told him about the vandalism at the Electric Cowboy of a car belonging to Nate Roberts, an employee of Racing Innovations. He said he was told that there were witnesses who could identify the people involved in the vandalism. He said that the vandalized car had a Racing Innovations logo and that he suspected a connection with the attempted burglary.

Deputy Strzelecki testified that although he was a patrol officer and had never presented a photograph lineup to a witness previously, he decided to expedite the investigation himself. He said that a detective would normally be the person to present a lineup. He said, however, that there would be a delay if a detective handled the investigation, which he did not think would be good in this case. He said he requested that Mr. Schwartz prepare two photograph lineups that included the Defendant and Viorel Ciobanu. He said that Mr. Schwartz gave him a one-page, six-person photograph lineup for each suspect and individual photographs of each person in the lineups. He testified that the six photographs in the Defendant's lineup contained men between the ages of eighteen and thirty, with short hair, and who appeared to be Caucasian, and that the photographs were printed in black and white ink on copier paper.

Deputy Strzelecki testified that he went to Racing Innovations and presented the

lineup to Christopher McKinney a few days after the vandalism occurred. He said he placed six individual photographs on a counter in front of McKinney, who "immediately and unquestionably pointed to the defendant's picture." He said he then arranged the other six individual photographs on the counter but that McKinney was unable to make an identification from them. He said that he also displayed the lineups to Jason Till but that Till could not identify anyone. He said he rearranged the photographs in a different order and that McKinney identified the Defendant a second time. He said that based upon this information, he obtained a warrant and arrested the Defendant.

Deputy Strzelecki testified that he had no training in presenting photograph lineups to witnesses. He admitted that he had not obtained any markings, such as initials or circling, on the photographs.

Deputy Strzelecki testified that he had misplaced the photograph lineups for a period of about two years but had recently found them. He said they had been misfiled. He acknowledged that the Defendant's individual photograph was missing, but he said that he had used that photograph to obtain the warrant or had used it when he executed the warrant.

Christopher McKinney testified that during the time period relevant to these events, he was employed as the parts manager of Racing Innovations. He said the victim of the vandalism was also employed there.

McKinney testified that shortly after midnight on January 30, 2007, he was in the parking lot of the Windsor Square Shopping Center in front of the Electric Cowboy when he noticed a dent in the victim's car. He said he entered the nightclub and informed the victim of the damage. He said that he went outside with the victim, Jason Till, and two or three bouncers from the nightclub. He said he saw people in a goldish silver Cavalier vandalizing the victim's car by jamming the passenger door of the Cavalier along the side of the victim's car. He said they were slowly backing up and slamming the Cavalier's door against the victim's car. He said he and the other people ran toward the Cavalier. He said he reached the front of the Cavalier and began banging on it to try to get the people to stop. He said "Kelly" was trying to break a window with his hand and that Mr. Till was kicking the side of the Cavalier. He said that as he was standing at the hood of the Cavalier, he could see the two people in the front seat for about thirty seconds. He said that he watched them from the time of the vandalism until they left the parking lot and that he could see them "as clear as day." He identified the Defendant as one of the people he saw in the Cavalier.

Mr. McKinney testified that Deputy Strzelecki came to Racing Innovations within a few days with "two photo arrays . . . [o]f who he believed was the driver and who he believed was the passenger." He said he identified the person in position five on the first photograph

lineup entered into evidence as the passenger. He said he "stopped on number three" in the second photograph lineup but that he was not able to make an identification. McKinney testified that Mr. Till was present but did not view the photograph lineups at the same time. He said Till was unable to make an identification.

Mr. McKinney testified that he had seen the Defendant before the vandalism incident, when the Defendant's brother had been arrested in connection with the attempted burglary of Racing Innovations. He said that he remembered about a month before the suppression hearing that he had seen the Defendant and another man beating on the back of a paddy wagon. He said he had not yet remembered this incident when he identified the Defendant in the photograph lineup and that he did not know when he identified the Defendant that the Defendant was the brother of Gregor Ciobanu, who had been arrested for the attempted burglary. He said he did not think that he had yet realized at the time of the preliminary hearing that he had seen the Defendant before the vandalism. He said he was positive that the Defendant was in the Cavalier and that Gregor Ciobanu was not.

Mr. McKinney testified that the Cavalier was being driven aggressively. He described the Cavalier's backing up, then coming toward him and his companions, and taking a sharp right. He said he thought the driver of the Cavalier was trying to run over him. He said he felt threatened. He said he was never behind the Cavalier and was unable to get a license plate number.

On cross-examination, Mr. McKinney initially stated that he did not recall testifying at the preliminary hearing that he recognized the Defendant as someone he had seen before the vandalism. He then acknowledged his testimony at the preliminary hearing in which he said he had never seen the Defendant before the vandalism and his subsequent testimony that he had seen the Defendant when the Defendant's brother was arrested. He said that his earlier claim of having only realized a month before the suppression hearing that he had seen the Defendant before the vandalism was incorrect. He claimed to have a photographic memory. He denied that he testified at the preliminary hearing that someone on foot vandalized the Cavalier and said that this must have been a transcription error in the transcript. He admitted that he had testified in a theft case involving Gregor Ciobanu.

Mr. McKinney testified that he described the suspect to Deputy Strzelecki as having a shaved head, medium build, darker complexion, Russian, and between the ages of eighteen and twenty-five. He denied having given Deputy Strzelecki the Defendant's surname before he viewed the photograph lineups. He said he and Mr. Till did not discuss the lineups before he identified the Defendant.

Jason Till testified that he was the general manager of the Electric Cowboy nightclub.

-4-

He said that in the early morning hours of January 29, 2007, he was standing at the front door of the nightclub and heard someone say that a car was being damaged. He looked outside and saw two people in a gray or silver Cavalier. He said the passenger door of the Cavalier was being opened repeatedly into Nate Roberts' Acura Integra. He said he saw two younger white men with short haircuts in the Cavalier but could not identify them. He said he kicked a large dent in the driver's rear quarter panel of the Cavalier, which he said he did in an attempt to stop or startle the car's occupants in order to identify them or remove them from the car.

Mr. Till testified that he was at Racing Innovations when Deputy Strzelecki brought the photograph lineups on February 8. He said he was friends with the people at Racing Innovations and "hung out" there frequently. He said Deputy Strzelecki "presented a couple of sheets of black and white photos, they all appeared to be driver's license photos, and asked us – us being Nate, Nathan Roberts, me and Chris McKinney, to look at the photos and see if we could identify the individuals that were occupying the car at the time of the vandalism." He said he was not able to make an identification. Mr. Till said he did not recognize the Defendant from the nightclub, nor did he recognize any of the Defendant's family members.

Nathan Roberts testified that he was an employee of Racing Innovations on January 29, 2007, but that he was currently employed at the Electric Cowboy. He said that in the early morning hours of January 29, he was at the Electric Cowboy when Mr. McKinney informed him that his car had been damaged. He said he went outside with several other people, where he saw the people in the Cavalier "basically mutilating [his] car with their car door." He called 9-1-1 and talked to the operator from about forty yards from the cars. He said he could see the heads of two white males in the Cavalier but was not able to provide a more specific description.

Mr. Roberts testified that he was at Racing Innovations on February 8 when Deputy Strzelecki came with the photograph lineups. He said he was not shown the photographs but saw the other individuals looking at the display of them on the counter. He then acknowledged that he saw the photographs that day but said he just glanced at them and did not attempt to make an identification.

Mr. Roberts testified that his car that was vandalized was a company car and had Racing Innovations logos on the front windshield and rear of the car. He said he had not seen the Defendant other than in court proceedings. He said he had not been a witness in a case involving an arrest of a Ciobanu family member for theft from Racing Innovations because it had occurred on his day off.

After hearing the evidence, the trial court made the following findings on the record while viewing the photograph lineups:

> What we have in front if us is, in effect . . . are two photo lineups presented to these individuals by Officer Strzelecki after asking that they be put together with a description[.] . . .

> And essentially, what I see in front of me is Xerox copies of two photo arrays composed of white males with short hair. And they appear to be driver's license photographs. Other than that, we know nothing about who is in front of us. We do not have any more description other than age, which was given somewhere during the course of this between 18 and 30, I think, given the full range between all the witnesses of who these people are.

> There are a few differences. Some of these individuals are much larger than other individuals. Some of them have – apparently, it's hard to tell on a Xerox copy, a little bit darker complexion or a little bit lighter complexion of identification.

> The basis, the underlying basis for the descriptions, which appear in these not too great spreads, was that of Mr. McKinney, as he testified. And the description that he gave, and he said he saw from the hood of the car was . . . he was focused on the passenger because the passenger was doing the damage. Shaved head, medium build, dark complexion, had no height, between 18 and 25, and Russian. And how he would know Russian other than the – or even Eastern European, if you will, without having some previous understanding of who that was supposed to be, or who he was looking for, is impossible looking in a Chevy Cavalier at two white guys with short hair.

> He didn't know if they were Russian. In fact, they aren't Russian, but he had no idea. So, therefore, it's my impression that the photo arrays are suggestive to a certain extent because they were composed by Officer Strzelecki who was trying to do the case all of the way through. And I give him credit for that. But these presentations were not done exactly correctly. They were not done in accordance with [] certain of the rules

-6-

presented. And, you're right, the foundation may not be quite there.

In the Court's opinion they are somewhat suggestive. However, I would also point out that the reasons I think they are somewhat suggestive are that they are black and white, that only Mr. McKinney gave an identification. And I think his identification had some problems with it. That Mr. McKinney had seen, says he had seen Mr. Ciobanu or one of his brothers previously. That Officer Strzelecki did all of the investigation and the lineup and the identifications, which gives me some concern. And that when Officer Strzelecki requested the lineups they already had the names Andrei Ciobanu and Gregor Ciobanu or Viorel Ciobanu.

And, therefore, I think there are some problems with the suggestivity this being a situation where all the individuals were involved at Racing Innovations. The question is, even if they are suggestive, and I think they are, are they permissible because they are reliable? And my problem here is that only Mr. McKinney, not necessarily Mr. Roberts who's the victim in the case, or any other witness, can identify, he says Mr. Ciobanu, by lineup and in this court room. He's the only one today who has identified him.

He said some things that contradicted what the others said as well. He said that he couldn't identify the driver even though he had a photographic memory. Maybe the driver's picture wasn't there. He remembered now that he had seen this Mr. Ciobanu, the defendant, before, but had not remembered before.

He said today that these individuals attempted to run over him. He was in front of the car. But everybody else has testified that they backed away from the situation. While not only was he in front of the car, but the bouncer, who didn't testify today, was trying to get the door open. And he didn't come here to identify anybody either.

. . .

-7-

But they were physically in front of the car and around the car, and these gentlemen, whoever they were, backed out.

So even though he didn't know who it was and only remembered Andrei Ciobanu later on, he knew they were Russian. He knew what they were looking for. I think that makes this an unreliable identification. I think that in this situation the photo array and the subsequent identification on the scene by Mr. McKinney are prejudicial to the point, toward Mr. Ciobanu, that they are unreliable. And I'm going to suppress it. I'm going to suppress [all] identification[s].

The prosecutor then made a series of inquiries and arguments to the court. The court made the following clarifications to its ruling:

It's hard to tell any distinctive features on a black and white Xerox copy. Number one.

. . .

[I]t's suggestive from the point of view that we can distinguish individuals. We can't distinguish sizes. We can't distinguish height. . . .

. . .

[B]ut the individuals were given this description. Officer Strzelecki drew this photo lineup from a description that said, the individuals had a shaved head, medium build, dark complexion, Russian, no height given, 18 to 25. And they did . . . their best.

. . .

They were not – they were suggestive in the manner in which they were presented because, I think, Officer Strzelecki was doing his best, but the way he presented them was –

. . .

-8-

Mr. McKinney testified that he saw the photo lineup very quickly after the event. That there were two arrays who [Deputy Strzelecki] believed were the driver and the passenger. And he couldn't tell whether it was the driver or not.

. . .

But only later did he testify about that the passenger was the one he had seen before when his brother was arrested in the [paddy] wagon. He said he didn't remember that then.

So I think there was some suggestiveness in the presentation of the photo array.

. . .

[I]n addition to [whether Mr. McKinney was told that one array was for the driver and the other for the passenger], to describe any of these photographs as they looked Russian, and this was the one, I have a real problem with that in a moving vehicle, at night, to whatever time after midnight it was, in a dark parking lot . . . I just think the identification is flawed there.

. . .

So I think Mr. McKinney, more than anything else, has been contradictory.

The court later issued a written ruling which included a detailed recitation of the evidence presented at the suppression hearing. It explained its ruling:

The court found . . . that the identification made by Mr. McKinney was in fact subject to suppression because it was suggestive and unreliable. The witness observed the defendant in the dark after midnight in a parking lot. No description of lighting was ever given. The witnesses and others saw through the glass window of the motor vehicle briefly and then it sped away at high speed. The witness demonstrated certainty as to the passenger but was not able to describe the driver. The length of time from the crime and the photo lineup was some ninety

days. Further, the photo lineup was [a] black and white xerox copy and no original photo lineup other than a black and white xerox copy was ever produced by Officer Strzelecki who produced it on the morning of trial. One of the witnesses could not identify Mr. Ciobanu and others had no memory of this individual. There being no other [corroborating] evidence beyond the photo lineup identification, which was in its manner of presentation and potential bias unreliable. The case is hereby dismissed and the state is entitled to a Rule 3 appeal of the ruling of this court.

On appeal, the State argues that the trial court erred in suppressing the evidence of Mr. McKinney's identification of the Defendant as the passenger of the Cavalier. The Defendant argues that the evidence supports the trial court's ruling.

An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Simmons v. United States, 390 U.S. 377 (1968), the United States Supreme Court discussed the potential hazards of an identification procedure involving photographs as opposed to a lineup. However, the Court also recognized the use of photographs as an effective procedure "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Id. at 384. It concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id.; see, e.g., Sloan v. State, 584 S.W.2d 461 (Tenn. Crim. App. 1978). The Court in Simmons noted that the potential for misidentification is increased when one photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one

-10-

of the persons pictured committed the crime." Simmons, 390 U.S. at 383 (footnote omitted). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967)).

However, even if a pretrial identification procedure was suggestive, suppression is only required when the totality of the circumstances shows that the identification was unreliable. Neil v. Biggers, 409 U.S. 188, 198-99 (1972). In Biggers, the United States Supreme Court set forth five factors to be considered when determining whether an identification is reliable and thus admissible: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Id. at 200. The court must consider the "totality of the circumstances" in determining whether the identification was reliable. Id.

The State argues that the lineup from which the witness identified the Defendant was not unduly suggestive simply because it consisted of black and white photographs and did not depict the individuals' size or build. According to Deputy Strzelecki's testimony, he gave Mr. Schwartz the names of the Defendant and his brother. He said that Mr. Schwartz accessed the Defendant's and the Defendant's brother's driver's license photographs and compiled the lineups using these photographs as reference points. Mr. Schwartz also testified that Deputy Strzelecki gave him the names and that after retrieving their photographs, he cross-referenced the suspects' physical characteristics with other individuals in a database and compiled the lineups. The record contains the photocopied black and white composite photograph lineup which includes the Defendant's photograph and the photocopied black and white individual photographs of the five men other than the Defendant depicted in the composite lineup. All six of the men appear to be young, white males with closely cropped hair. Some variations in hair, eye, and skin color are noticeable, but these details are limited by the quality of the photocopied photographs and their black and white nature. The photographs appear to be of the type used on driver's licenses and depict the head and neck area of each man against a neutral background.

This Court has recognized the use of black and white photograph lineups. See State v. Jose E. Molina, No. M2005-01033-CCA-R3-CD, Davidson County, slip. op (Tenn. Crim. App. July 25, 2006) (holding that use of black and white photographs was not unduly suggestive where color photographs would have depicted the defendant in an orange jail jumpsuit). A lineup is not unduly suggestive if the suspects are not "grossly dissimilar."

-11-

State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993). The lineups used in the present case do not contain photographs that are grossly dissimilar in appearance. We note, as well, that photograph lineups typically consist of "head shots" that do not depict the individuals' size and build. In the present case, the witness observed the suspect sitting in a car, and his opportunity to observe size and build characteristics would necessarily have been limited. There is nothing unduly suggestive about the use of "head shots" rather than photographs which depict size and built.

We consider next the manner in which Deputy Strzlecki presented the lineups to the witness. The trial court noted that the officer was inexperienced, having never presented a lineup to a witness, and that the officer did not follow procedures such as having the identified photograph signed or otherwise marked by the witness, giving instructions about viewing the photographs, or following "blind procedures of identification." The record reflects that Deputy Strzelecki testified that he told the witnesses "[j]ust very briefly that I was going to lay out some . . . photographs and if they saw the suspect in one of the photographs to point to him." He acknowledged that he did not have Mr. McKinney sign or mark the photographs of the Defendant. We note, however, there is no dispute that McKinney selected the Defendant from the lineup or that the photograph depicted the Defendant. Although the officer had requested that the Defendant and his brother be the subjects of the lineups, he testified that he did not tell the witnesses that the Ciobanu brothers were in the photographs. There is no indication in the present case that any failure to follow usual procedures, which were not affirmatively established by the proof, contributed any undue suggestion to the process. Finally, Mr. McKinney's failure to identify a subject in the second lineup and Mr. Till's failure to make an identification from either lineup support that the manner in which the lineups were presented did not improperly suggest the Defendant as one of the perpetrators.

We conclude that the identification procedure was not unduly suggestive. The trial court erred in suppressing the identification and dismissing the case.

The trial court also erred in concluding that the totality of the circumstances demonstrated that the identification was unreliable. The trial court was heavily influenced by its finding that Mr. McKinney's testimony was not credible. However, the court's order is incorrect as to several pertinent facts. Even giving the Defendant, as the prevailing party, the benefit of the facts accredited by the trial court and supported by a preponderance of the evidence, we conclude that the totality of the circumstances does not demonstrate an unreliable identification.

Our analysis focuses on the Biggers factors. First, with respect to the witness's opportunity to view the perpetrator at the time of the offense, Mr. McKinney testified that

-12-

he was standing at the hood of the Cavalier and could see the two people in the front seat for about thirty seconds. He said that he watched them from the time of the vandalism until they left the parking lot and that he could see them "as clear as day." The trial court was influenced by the fact that the incident took place "after midnight in the parking lot," its conclusion that the parking lot was "dark," and the lack of proof about the lighting. The court also noted that the other witnesses were able to see through the glass window before it sped away but that Mr. McKinney was the only one who identified the Defendant. Upon review, we hold that the evidence preponderates against the trial court's finding on this factor. Mr. Roberts testified that he was standing about forty yards away on the sidewalk near the nightclub and was able to see two white males in the Cavalier. Similarly, Mr. Till testified that he was at the door of the nightclub and could see two young, white males with short hair in the Cavalier. The trial court did not make an adverse credibility finding with respect to either Mr. Roberts's or Mr. Till's testimony. Thus, we conclude that although the lighting of the parking lot was not directly addressed by the proof, the evidence does not support the trial court's assumption that there was inadequate lighting for Mr. McKinney to have sufficiently observed the passenger of the Cavalier. This factor weighs in favor of admission of the evidence.

The second factor is the witness's degree of attention. In this respect, Mr. McKinney testified that he focused on the passenger, who was the person doing the damage to the victim's car, and that he looked the passenger in the eye. The court found that Mr. McKinney was able to observe the subjects "through the glass window [of the Cavalier] briefly" before the car sped away, although the court generally discounted Mr. McKinney's credibility. This factor weighs in favor of suppression.

Third, Biggers requires the court to consider the accuracy of the witness's prior description of the perpetrator. The trial court found:

> Ninety days [after the vandalism at Racing Innovations, Deputy Strzelecki] was called to a vandalism at the 'Electric Cowboy' where a motor vehicle there was being damaged by two people in a Chevy Cavalier. The officer spoke to the witnesses who identified them as the individuals who were at the scene of the arrest of Mr. Ciobanu's brother.

The evidence preponderates against these factual findings. The record reflects that Deputy Strzelecki did not respond to the scene. Rather, he learned of the vandalism sometime later when he was patrolling near Racing Innovations and was informed that there were witnesses who could describe the perpetrators. Deputy Strzelecki did not specifically identify Mr. McKinney as one of the people who gave him a description, although Mr. McKinney testified

-13-

that he described the Defendant as having a shaved head, medium build, darker complexion, Russian, and between the ages of eighteen and twenty-five. The record reflects that the court was disturbed by Mr. McKinney's description and found, "The Defendant is in fact a short sandy haired, medium built, average complexioned Romanian between the ages of 18 and 25." We do not believe the differences in the description given by Mr. McKinney and the trial court's description of its observation of the Defendant were significantly different. Further, the court did not discredit Mr.McKinney's testimony that this was the description he gave Deputy Strzelecki. However, the court discounted Mr. McKinney's ability to have determined that the perpetrators were Russian or Eastern European "without having some previous understanding of who that was supposed to be, or who he was looking for." We reject the notion that it was impossible to discern characteristics about a suspect that are indicative of ethnic origin, and the witness's previous description is not inconsistent with the Defendant's appearance in the photograph. In his testimony, Mr. McKinney first stated that he had not seen the Defendant at the scene of the earlier attempted burglary at Racing Innovations, but he later acknowledged that he had. The court noted this inconsistency in discrediting Mr. McKinney's testimony on this point, and the evidence does not preponderate against its factual finding that Mr. McKinney had seen the Defendant on an earlier occasion. However, the fact that a witness has seen a suspect on a previous occasion does not necessarily mean the identification was unreliable. The court made no finding that Mr. McKinney was motivated by any animosity toward the Defendant or the Defendant's family, and the record does not contain any proof to support such a finding. Given the accuracy of the witness's description of the perpetrator, we weigh this factor in favor of admission of the evidence.

The fourth <u>Biggers</u> factor is the level of certainty demonstrated at the confrontation. Mr. McKinney testified that he was "100 percent certain" in his identification of the Defendant as the suspect. Although the trial court doubted the Defendant's credibility, Deputy Strzelecki testified that Mr. McKinney identified the Defendant immediately and without hesitation. This factor weighs in favor of admission of the evidence.

The final factor pertains to the time elapsed between the crime and the confrontation. The trial court stated that the time between the crime and the identification was ninety days. The record reflects, however, that the crime took place on January 30, 2007, and the photograph identification took place on February 8, 2007. This brief time period supports weighing this factor in favor of admission of the evidence.

We conclude that upon review of the totality of the circumstances, the <u>Biggers</u> factors support admission of the evidence of the witness's pretrial identification of the Defendant as the perpetrator of the vandalism. Thus, we conclude that even if the trial court correctly determined that the lineup was unduly suggestive, the court nevertheless should have denied

the motion to suppress.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed. The case is remanded with instructions that the order suppressing the evidence of the pretrial identification and dismissing the case shall be set aside.


_____
JOSEPH M. TIPTON,  PRESIDING JUDGE