IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

MARCH 1998 SESSION

FILED

December 31, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9609-CC-00404 |
| | ) | |
| | ) | Cheatham County |
| v. | ) | |
| | ) | Honorable Allen W. Wallace, Judge |
| | ) | |
| TERRY W. SMITH, | ) | (Aggravated kidnapping, attempted aggravated |
| | ) | rape) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

G. Kline Preston, IV
Washington Square Two, Suite 416
222 Second Avenue North
Nashville, TN 37201

For the Appellee:

John Knox Walkup
Attorney General of Tennessee
        and
Lisa A. Naylor
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Dan M. Alsobrooks
District Attorney General
Court Square, P.O. Box 580
Charlotte, TN 37036-0580
        and
James W. Kirby
Assistant District Attorney General
105 Sycamore Street
Ashland City, TN 37015

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Terry W. Smith, appeals as of right following his convictions in the Cheatham County Circuit Court for aggravated kidnapping and attempted aggravated rape, both Class B felonies. He was sentenced as a standard, Range I offender to ten years confinement in the custody of the Department of Correction for each conviction, to be served concurrently. On appeal, he presents the following issues for our review:

> (1) whether the evidence is sufficient to support the convictions;
>
> (2) whether the trial court erred by denying his Motion to Suppress the victim's identification of the defendant in a lineup;
>
> (3) whether the state's failure to provide the defendant with a copy of a videotape until the day of trial violated the defendant's rights to due process and a fair trial;
>
> (4) whether the state's failure to conduct an investigation violated the defendant's due process rights;
>
> (5) whether the trial court erred by allowing the state to present evidence of the defendant's criminal history at trial; and
>
> (6) whether the trial court erred in sentencing by failing to find mitigating factors.

We affirm the judgments of conviction.

Judy Smith, the victim, testified that on January 1, 1995, she and her estranged husband, James Smith, saw a movie in the afternoon, ate dinner and returned to James Smith's house at about 7:00 p.m. She said she then went to a Shell station to use a pay telephone to call her babysitter to check on her daughter. She said James Smith did not have an operable telephone in his apartment. She said the pay telephone was outside of the Shell station. She said that she got out of her car to use the telephone, but a man was using it. She said she turned around to walk back to her car, and she saw the defendant standing next to her car holding a hunting knife with a

2

fixed blade. She said the defendant told her to get in her car and drive. She said she had to go through the back driver's side in order to open the front passenger's door to let the defendant in her car because the front passenger's door did not have a handle on the outside.

Ms. Smith testified that once inside the car, the defendant ordered her to drive and gave her directions. She said he eventually directed her to the fairgrounds in Ashland City and told her to stop. She said he told her to get out, and when she did, he pushed her down into a mud puddle. She said she stood up, and he told her to take off her clothes. She said she stripped down to her bra and panties, and he pushed her down into the mud puddle again. She said he then started to undo his pants and get on top of her when a car drove by. She said the approaching car scared the defendant, and he got up, climbed a fence and ran away.

Ms. Smith said she got into her car and drove to her husband's house. She said she was still wearing only her bra and panties. She said she arrived at his house at 7:30 or 7:45 p.m., and he called an ambulance. She said she went to the hospital, but she did not explain what had happened to her until about 9:00 or 9:15 p.m. when she was at the police station. She said she described her attacker to Detective Marc Coulon and Phyllis Shafer of the Ashland City Police Department. She said she told them that her attacker was a short black male with a "scruggy" beard, and that he was wearing a black or dark blue baseball cap with the letter "S" on it and a light windbreaker jacket.

Ms. Smith testified that shortly thereafter, she was asked to identify the attacker from a lineup. She said the lineup consisted of four black males, and they were standing outside with lights shining on them. She said the officers told her to look at all four suspects and to be certain she knew which one was the attacker. She said

3

she looked over the men once, then a second time. She said the third time the men had lights flashing on their faces, and she identified the defendant. She said the defendant was wearing the same clothing during the lineup as he was wearing when he attacked her. She said she had no doubt that the defendant was the attacker and that the officers told her to be certain she made the correct identification. She said none of the officers did anything to indicate who she should pick. She said that although she was very emotional, she felt calm when she identified the defendant.

On cross-examination, Ms. Smith testified that she got a full front view of the defendant as she was walking to her car at the Shell station. She explained that she opened the door for the defendant instead of trying to run away because he had a knife and she was scared. She said the defendant may have threatened to kill her, but he did not say that he was going to rape her. She said she did not remember if the other men in the lineup were wearing hats with an "S" on them, although she admitted that at the preliminary hearing, she testified that the hat was a key factor in her identification. She said she thought the defendant had a full set of teeth. She said she could not explain why there did not appear to be any mud on the rear of the jeans she was wearing when she was pushed into the mud puddle. She testified that the fence the defendant jumped when he ran away was about as tall as his neck, and it had barbed wire on top. She said that at the preliminary hearing, she testified that the defendant was wearing a blue jacket, dark pants, and had no identifiable facial characteristics. She said that at the lineup, she identified the defendant on her third look because she wanted to be certain of the identification. She said she remembered the defendant's eyes because they looked devious. On recross-examination, Ms. Smith said that she would have remembered if the defendant had been missing a front tooth.

Officer Scott Davidson of the Ashland City Police Department testified that at 7:30 p.m. on the night of the incident, the dispatcher reported a possible rape. He

4

said that he and another officer went to the Shell station to look for witnesses and evidence. He said he then went to the fairgrounds and found a T-shirt and blue jeans lying in a mud puddle. He said that he secured the scene and waited for other officers to arrive.

Officer Ray Morris, also of the Ashland City Police Department, testified that he met James Smith at Smith's house. He said the victim was there, wrapped in a blanket, and she was too upset to talk. He testified that James Smith said the victim told him that somebody tried to rape her at a pay telephone. Officer Morris said the victim was screaming and crying, and he could not get her to calm down. He said the victim appeared to be more composed at the lineup.

Cindy Mason testified that she was working at the Shell station on the night of the incident. She said that sometime after dark, three black men came into the store. She said two of the men were rowdy, and a third man explained that the other two men were drunk. She said the men were driving a big, old, dark car. She said the men left but then came back not more than an hour later to get a dollar's worth of gas. She said the men were then arrested. She identified the defendant as one of the men that was allegedly drunk. She admitted that she told her employer she had not seen anything that night, but she explained that she meant she could not see the victim or the pay telephone.

James Smith testified that on the evening of January 1, 1995, the victim went to the Shell station to use a pay telephone. He said that it was taking longer than he expected for her to return, and he was beginning to worry about her. He said that when the victim did return, she was wearing only a bra and panties, and she was screaming and crying. He said the victim told him she had been raped. He said that he ran upstairs to call 9-1-1, and the victim was hysterical. He said he had never seen her

5

like that.  He said he went with the victim to the hospital and then to the police station.  He said that at the station, the victim described the attacker as a short, heavy black man wearing a dark hat with an "S" on it.  He said the victim became emotional when she identified the defendant from the lineup.  He testified that she threw her arms around him and shook, saying, "That was him.  I know it's him.  That was him."

Phyllis Shafer, an administrative assistant with the Ashland City Police Department, testified that her duties include attending interviews with female victims to make them more comfortable.  She said she went to the medical center to see the victim, and the victim seemed scared.  She said the victim related the following events to her:   A black male put a knife to her, forcing her to get into a car and drive to the fairgrounds.  The man pushed her out of the car into a mud puddle, then told her to take off her pants.  The man threw the pants in a mud puddle and pushed her down again.  He then told her to take off her top, which she did, and he tore or cut her bra.  He pushed her down, stood over her, and started to take off his pants, but a car drove up, and the man left.

Ms. Shafer said the victim told her that the man did not penetrate her.  She said the victim described the attacker as a fat black male with a "close-crop type beard," wearing glasses and a black or blue cap with an "S" on it.  Shafer testified that she was present when the victim identified the defendant in the lineup.  She said the victim was frightened, and the first time the victim looked, she said "I think that's him." Shafer said Detective Coulon told the victim to be sure, and the victim looked again and said, "Yes, that's him, I'm sure of it." Photographs of the victim taken at the hospital revealing dirt and a bruise on the victim's neck and hip were introduced into evidence.  On cross-examination, Shafer said she did not recall the defendant wearing glasses at the lineup.

6

Officer David Branson of the Ashland City Police Department testified that he was not on duty the night of the incident, but he heard about it on his radio. He said he got in his personal car and went to the fairgrounds to check the scene. He said he arrived at the fairgrounds at about 8:00 p.m. and left a little after 9:00 p.m. He said he stayed in his car and positioned the car such that he had a view of the road. He said that he noticed a car traveling down the road at a high rate of speed, although he did not know the exact speed because he did not have his radar. He said that about thirty to forty minutes later, he went to the Shell station to check the scene. He said he saw the defendant's car at the Shell station and recognized it as the car that he saw at the fairgrounds. He said the car was a two-tone black four-door Cadillac. On cross-examination, Branson admitted that it was rainy and misty that night.

Detective Marc Coulon of the Ashland City Police Department testified that he went to the fairgrounds and recovered the victim's jeans and T-shirt with Officer Morris. He said the jeans had mud on the leg. He said he then went to the hospital and talked briefly with the victim. He said the victim was scared and was crying. He said she gave a brief description of the attacker, and it was essentially the same description the victim gave later that night at the police station.

Detective Coulon testified that at the police station, the victim appeared worried and emotional. He said he interviewed the victim for about an hour because he wanted to be certain that her version of the events was consistent, and she was telling the truth. He said she described the attacker as a short, fat, black male with a "scraggly" beard and a partial mustache, wearing dark clothes and a black cap with an "S" on it. He said the victim described the attacker at about 9:00 p.m., and he subsequently put all officers on a lookout for someone matching that description. He said that shortly thereafter, the defendant and his two brothers were located and brought to the police station. He said the defendant fit the victim's description.

7

Detective Coulon testified that he wanted to have six men in the lineup, but he had only four because he could find only one black male who resembled the victim's description in addition to the defendant and his brothers. He said the victim stayed in the police chief's office and looked out of a two-by-three foot window into the parking lot where the lineup occurred. He said he placed the men twenty to twenty-five feet from the window and parked a patrol car to the right of the window with the headlights shining on the men in order to recreate the lighting when the incident occurred. He said he used a spotlight once to shine on each man individually. He said he instructed the victim to look outside and see if she could identify anybody. He said the victim became emotional and said, "That's him. Number three," meaning the defendant. He said no identifiable fingerprints were found in the victim's car.

On cross-examination, Detective Coulon said the victim did not describe the defendant as wearing glasses, although he knew that Ms. Shafer reported that the victim described the attacker as wearing glasses. He said that no knife was found, and he did not try to get a search warrant for the defendant's house to look for a knife. He said the fence at the fairgrounds was about the defendant's shoulder height with barbed wire on top. He said he did not check the fence for clothing remnants because he did not know the defendant had climbed the fence until trial. He said he did not check the defendant for any wounds. He said he did not do any fingernail tests nor comb the victim's car for hair. He admitted that after the defendant was arrested, he told an employee of the Ashland City newspaper that the investigation was ongoing, but he explained that he considered the investigation to be ongoing until the trial was complete. He said that in the lineup, only the defendant wore a hat with an "S" on it.

On redirect examination, Detective Coulon testified that all the men in the lineup were wearing the clothes they had on when they were taken into custody. He said they were wearing dark clothes. He said that the absence of fingerprints was not

8

unusual because fingerprints usually become smudged when the fingers slide across a surface. He said that he believed it would have been easy to jump the fence at the fairgrounds.

Ruth Hunter testified that she is the manager of the Shell station. She said that the pay telephone is on the side of the building but that it did not work on the night of the incident and had been inoperable for some time. She said she was called into work on the night of the incident to retrieve the videotape that was recording inside the station that night. A portion of the videotape was played for the jury. Hunter testified that she recognized the defendant in the videotape, and the videotape registered 8:50 p.m. On cross-examination, Hunter said the time registered on the videotape may have been one hour ahead or one hour behind because of the daylight savings time change.

Detective Coulon testified again and said that he had kept possession of the videotape from the night he got it from the Shell station. He said that he did not examine the videotape to see if there were any other black males in the Shell station that night. He agreed that the videotape showed a black male at 9:48 p.m. then again at 10:18 p.m. He agreed that the man on the videotape at 10:18 had a white spot in the middle of his baseball cap. On cross-examination, Detective Coulon said he could not positively identify the man on the videotape as the defendant. He said that there were two other black men on the videotape, but they did not match the victim's description of the attacker.

Lenzo Smith, the defendant's father, testified that his birthday is December 31, and the family always gathers on New Year's Day to celebrate. He said that on January 1, 1995, his family, including the defendant, had dinner together at his house at about 6:00 p.m. He said that everyone stayed at the table until about 7:30

9

p.m. He said that earlier in afternoon, he, the defendant, and another son started to drive to Nashville in a white Buick. He said they had to turn around and go back home when they realized they did not have enough gas. He said that as they were driving home, he met his daughter by chance at a Pantry store, and she gave him a check for gas. He said he put gas in the car and went back home. He said that his house is about twelve miles from Ashland City. He said that the defendant and two of the defendant's brothers left the house after 8:00 p.m. to go to Nashville. He said the two brothers arrived back at the house around midnight.

On cross-examination, Mr. Smith said his wife left the house that night before the defendant, and she was also headed to Nashville. He said he was unaware that his son Richard testified at the preliminary hearing that Richard told a Shell station employee that he and his brothers had been partying in Nashville and were drunk. He said that when the defendant left home that night, he was wearing a black Chicago Bulls jacket, dark jeans, and a cap with "SOX" on it. He said the defendant is about five-feet, six-inches tall, weighing about two hundred and ten pounds. He said the defendant does not grow a beard and seldom has to shave, although he usually has a slight mustache. He said that from looking at the photograph of the defendant in the lineup, it did not appear that the defendant had a mustache.

Helen Smith, the defendant's stepmother, testified that the defendant, her husband, Richard and Lenzo, Jr. went to Nashville the afternoon of January 1, 1995. She said her husband did not make it to Nashville because he did not have enough gas. She said she realized her husband might run out of gas, so she sent his daughter in that direction with a check for gas money. She said they all ate dinner from about 6:00 to 7:15 p.m. She said she used her son-in-law's cellular telephone to call her grandchildren in Nashville. She said she left to go to Nashville around 7:45 to 8:00 p.m. She testified that the defendant could not have committed the crimes.

10

On cross-examination, Helen Smith testified that her husband, the defendant, Richard and Lenzo, Jr. left to go to Nashville at about 4:00 p.m. and returned around 5:30 p.m. She said it takes about thirty minutes to get from their house to Ashland City. She said she returned home from Nashville at about 10:00 p.m. that night, and Richard and Lenzo, Jr. were there. She testified that the defendant was good natured and had a heart. She admitted that she knew the defendant when he was arrested twice in 1987 for assault, in 1991 for aggravated assault, and in 1995 for a drug charge. She said the defendant does not have a full set of teeth.

On redirect examination, Helen Smith said that the defendant has been missing a front tooth since he was sixteen. She also said the defendant was not convicted of any of his previous charges.

Michael Scales, the defendant's brother-in-law, testified that he ate dinner with the family on January 1, 1995. He said he brought his cellular telephone, and the defendant used the telephone to call the defendant's sister at 7:21 that night. He said he knew the time because he asked for it to be made a part of his billing records.

On cross-examination, Scales testified that he arrived at the house around 6:00 p.m. and ate dinner from 6:15 to 6:30. He said that Mr. Smith, Richard and Lenzo, Jr. were not there when he arrived but the defendant was. He said he did not remember when Mr. Smith, Richard and Lenzo, Jr. returned nor did he remember if Lenzo, Jr. was at the house. He said he also did not remember when the defendant left the house that night. He said that he saw the defendant at the house the next morning. After looking at the defendant's photograph from the lineup, he said it looked like the defendant had a full set of teeth.

11

The defendant testified that he went to a gathering for his father on January 1, 1995. He said that he, his father, and his older brother started out toward Nashville that afternoon but turned around because they did not have enough gas. He said they ran into his sister, and she gave them a check for gas money. He said they went back to the house and ate dinner at about 7:15 p.m. He said he stayed until 9:00 or 9:30 p.m., then left with his two brothers for Nashville to find his nephew. He said they traveled in a dark green Cadillac. He said they could not find his nephew in Nashville, and they headed back toward Ashland City. He said they stopped to fix their car at a Ryder rental truck store, and he knew one of the men working there. He said the man asked him to go to the Shell station to buy some cigarettes, and he and his brothers went to the station. He said that while they were there, officers arrived and arrested him.

The defendant testified that the officers took him and his brothers to the police station and had them stand in a lineup. He said he was the only one in the lineup wearing a hat with "SOX" on it. He also said he was the only chubby man in the lineup. He said the photograph of him in the lineup does not reflect a beard because he cannot grow one. He said he might have a mustache in the photograph. He said that he stayed in jail one month before he was released on bond, meaning that his brother-in-law could not have seen him the next morning at the house. The defendant testified that when he was arrested, he was wearing a White Sox hat, a black Chicago Bulls jacket with a big red bull on the back, blue jeans, and big thick shoes. He said the barbed wire fence at the fairgrounds came up to his chin, and it would have been very difficult for him to have jumped it. He said he did not wear glasses and did not drink. He said he was in the wrong place at the wrong time.

On cross-examination, the defendant said that he left with his father and brother to go to Nashville at 3:00 p.m. He said they got back home at about 4:00 p.m.

12

after they realized they had no gas and turned around. He said they ate dinner at about 7:00 p.m. and finished at about 8:00 p.m. He said he and his brothers left to go back to Nashville at about 9:00 or 9:30 p.m. He said they arrived in Nashville at about 10:00 and stayed until 10:30 p.m. He said they stopped at Ryder at about 11:00 p.m. to fix the alternator on the Cadillac then went to the Shell station at about 11:15 p.m. He admitted that he could not explain how he could have been arrested at 9:35 p.m. yet claim to have been at the Shell station at 11:15 p.m. He admitted that he could not have gone to Nashville, stayed thirty minutes, then driven back to Ashland City from 9:00 to 9:35.

The defendant admitted to having hair on his lip, but he said he would not call it a mustache. He said he heard that Cindy Mason was fired from the Shell station for selling drugs. He said he had never seen the victim before, but he could not explain why the victim was able to describe him. He said he had never heard of the fairgrounds before this case. He said Officer Branson did not see his Cadillac driving past the fairgrounds that night but that it might have been a man who travels from Ashland City to Clarksville in a Cadillac.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his convictions for attempted aggravated rape and aggravated kidnapping. With respect to the attempted aggravated rape conviction, he argues that there is no proof that he touched the victim in an attempt to penetrate her, and there is no evidence that he took a substantial step toward the completion of the crime because he did not take off his clothes, and the victim was still wearing a bra and panties. With respect to the aggravated kidnapping conviction, the defendant argues that it is not a distinct and separate offense from attempted aggravated rape. The state argues that the evidence

13

is sufficient to support both convictions and that aggravated kidnapping is a separate offense from attempted aggravated rape.

## A. ATTEMPTED AGGRAVATED RAPE

The defendant argues that the evidence is insufficient to support his conviction because there is no evidence that he took a substantial step toward the completion of the crime. He contends that there is no proof that he touched the victim in an attempt to penetrate her, and neither he nor the victim were unclothed.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Tenn. Code Ann. § 39-12-101 defines criminal attempt as follows:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

. . .

(3) [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Aggravated rape is defined as "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon . . . ." T.C.A. § 39-13-502(a)(1).

14

We believe that the evidence is sufficient to support the defendant's conviction for attempted aggravated rape. Taken in the light most favorable to the state, the evidence shows that the defendant, brandishing a knife, forced the victim to drive to a remote location. He then made her get out of her car and take off her clothes. The defendant then pushed the victim to the ground, tore her bra, and started to undo his pants. A rational trier of fact could have concluded that the defendant's actions showed an intent to commit aggravated rape and constituted a substantial step toward that end.

## B. AGGRAVATED KIDNAPPING

The defendant argues that his conviction for aggravated kidnapping cannot stand because it is not a separate and distinct offense from attempted aggravated rape. He contends that our supreme court's holding in State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991), precludes convictions for both offenses because the detention of the victim in the present case was no more than was necessary to carry out the attempted aggravated rape. Thus, he argues that the dual convictions violated his right to due process under both the Tennessee and United States Constitutions.

The defendant's reliance on Anthony is misplaced. In Anthony, an armed robbery and kidnapping case, the court specifically noted that the victims were detained only briefly, they were not harmed in any way, and they were not taken to a different location where they might have been subject to additional harm. Id. at 307. The court stated that if the victims in Anthony had been moved from the scene of the robbery "under circumstances giving rise to 'a substantially increased likelihood of harm to the victims,'" the court's conclusion may have been different. Id. at 308 (citation omitted).

The facts of the present case reveal a situation far different from that in Anthony. Here, unlike in Anthony, the victim was not detained only briefly. On the

15

contrary, she was forced to drive for about fifteen minutes to a remote location where she was subject to additional harm.  The defendant's passing contention that every rape involves some degree of detention is immaterial in light of the facts of the present case.  The defendant engaged in far more than mere detention for the sole purpose of attempting to commit an aggravated rape because he forced the victim to drive to a completely different location about fifteen minutes away.  The aggravated kidnapping facilitated the attempted aggravated rape rather than being incidental to it.  We conclude that the facts of this case are significantly different from Anthony, and the defendant's due process rights were not violated by dual convictions for attempted aggravated rape and aggravated kidnapping.

## II.  LINEUP

The defendant argues that the trial court erred by denying his Motion to Suppress the victim's identification of him in a lineup on the night of the offense.  He contends that the lineup was so suggestive that both it and the victim's subsequent identification of him at trial were unreliable and violated his due process rights.  The state contends that the procedures used in the lineup were not unnecessarily suggestive.

At the suppression hearing, the defendant testified that the lineup consisted of him, his two brothers, and another black male whom he did not know.  He said the lineup was conducted outside, and he said that an officer kept walking by him. He also said that an officer pulled down his cap.

Detective Marc Coulon testified that the victim went through the lineup twice before she identified the defendant.  He said it took the victim about three or four minutes to identify the defendant, but she did not waver when she identified him.

16

At the end of the suppression hearing, the trial court denied the defendant's motion. The court stated that it was unclear whether an officer touched the defendant's cap and when the touching occurred. However, it determined that even if an officer did touch the defendant's cap, under the factors set forth in Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 381-82 (1972), the procedures used and the victim's identification did not violate the defendant's due process rights. We agree.

When the constitutionality of a lineup is challenged, suppression is only required when there is an unnecessarily suggestive procedure, and the totality of the circumstances show that the identification was unreliable because of the suggestiveness. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977). In addition, a subsequent in-court identification is proper unless the pretrial identification was so suggestive that there is a substantial likelihood of irreparable misidentification. See Sloan v. State, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978).

In Neil v. Biggers, the Supreme Court identified the following factors to be considered when determining whether an identification is reliable and thus admissible:

> (1) the opportunity of the witness to view the criminal at the time of the crime,
>
> (2) the witness' degree of attention,
>
> (3) the accuracy of the witness' prior description of the criminal,
>
> (4) the level of certainty demonstrated by the witness at the confrontation, and
>
> (5) the length of time between the crime and the confrontation.

We believe that these factors all favor the reliability of the identification in the present case.

The victim had ample opportunity to view the defendant at the time of the offenses. She testified that she had a full front view of the defendant at the Shell

station.  In addition, she was held captive by the defendant for about fifteen minutes, thus allowing her time to view him.

The victim's degree of attention is evidenced by the accuracy of her description, and both of these factors favor admissibility.  She described the defendant as a short, fat black male with a "scruggly" beard, a dark jacket, dark pants, and a hat with an "S" on it.  She also testified that she remembered the defendant's eyes because they were squinty and looked devious.  The photograph of the defendant made during the lineup and admitted into evidence at trial reveals that the victim's description was accurate.

The defendant complains that the victim's description was not reliable because it was inaccurate and inconsistent.  He argues that the victim told Phyllis Shafer that the attacker was wearing glasses and had a full set of teeth, neither of which accurately describes him.  We still believe that under the factors set forth in Neil v. Biggers, the victim's identification is reliable.  A victim's description need not be perfect to be reliable.  See State v. Henry Lee Martin, No. 01C01-9411-CR-00397, Davidson County (Tenn. Crim. App. May 24, 1996), aff'd as modified, 964 S.W.2d 564 (Tenn. 1998) (concluding that, "[a]lthough imperfect, the descriptions the witnesses gave police are sufficiently consistent with the defendant.").  A comparison of the victim's description to the photograph of the defendant before the lineup, combined with the factors in Neil that favor admissibility, lead us to conclude that the victim's description was reliable, and the trial court did not err by denying the Motion to Suppress.

The level of certainty of the victim and the length of time between the crime and the identification also favor admissibility.  The victim testified at trial that when she identified the defendant in the lineup, she was certain that he was the

18

attacker. Detective Coulon testified that the victim never wavered in her identification. The defendant complains that because the victim did not immediately identify him, her identification is unreliable. On the contrary, we believe that the victim is to be commended for realizing the importance of her identification and not jumping to a rushed decision. In addition, the fact that the identification occurred a mere three hours after the attack lends credibility to the victim's identification because the events were fresh in her mind.

Finally, the defendant complains that he was the only person in the lineup wearing a cap with an "S" on it, and an officer pulled down his cap during the lineup. We are unpersuaded. A review of the photographs of the men in the lineup reveals that all four men were wearing baseball caps. Although the defendant's cap appears to be the only one with a white "S" on it, his cap also has an "O" and an "X" on it, letters which the victim did not include in her description of the defendant. In addition, one of the other men in the lineup is wearing a hat with an off-white "S" on it. Although the victim testified at the preliminary hearing that the hat was a key factor in her identification of the defendant, she testified at trial that she could not remember whether the other men in the lineup had hats with an "S" on them. This fact, combined with her testimony that she remembered the defendant's squinty eyes, points to the conclusion that the defendant's hat was not the sole basis for her identification.

With respect to the defendant's contention that an officer pulled down his hat, we note that there is no evidence that the hat was pulled down during the lineup. Furthermore, the victim testified that the officers did not do anything to suggest which man she should pick. We conclude the lineup was not so unnecessarily suggestive that the defendant's due process rights were violated.

### III. BRADY MATERIAL

19

The defendant argues that the state failed to produce requested exculpatory material in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). Specifically, he argues that the state failed to provide a copy of the Shell station videotape, pictures of the victim's bruises, and the results of a fingerprint analysis of the victim's car performed by the Ashland City Police Department. The state responds that the defendant had an opportunity to view the videotape and the pictures before trial. It asserts that the defendant waived any issue respecting the photographs because he failed to object to their admission at trial and failed to raise the issue in his Motion for a New Trial. Finally, the state argues that even if the evidence was wrongfully withheld, the defendant suffered no prejudice.

In Brady, the United States Supreme Court determined that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97; see also Hartman v. State, 896 S.W.2d 94 (Tenn. 1995). However, the state is not required to disclose information that the defendant already possesses or is able to obtain. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Before a defendant is entitled to relief under Brady, he must establish that (1) the prosecution suppressed the evidence, (2) the evidence suppressed was favorable to the defendant, and (3) the evidence was material. 373 U.S. at 87, 83 S. Ct. at 1196-97. Evidence is considered material under this standard only if there is a reasonable probability that had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995) (citation omitted); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). In addition, the burden of proving a Brady violation rests with the defendant, and

20

the violation must be proven by a preponderance of the evidence.  Edgin, 902 S.W.2d at 389; State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993).

## A.  VIDEOTAPE

First, the defendant argues that the state failed to disclose the existence of the videotape made at the Shell station on the night of the offense until the day of trial and that he did not have an adequate amount of time to review the videotape before trial.  He contends that the videotape establishes a time line within which the defendant was present at the Shell station and could have been used to contradict the testimony of Cindy Mason.  The state asserts that the trial court ordered that the trial be continued until 1:00 p.m. in order for the defendant to have an opportunity to review the videotape.  The defendant responds that he did not have an opportunity to view the videotape until 1:00 p.m., which was after Cindy Mason had testified.

A careful review of the record reveals that when the trial court discovered that the defendant had not had an opportunity to view the videotape on the morning of trial, it ordered that the videotape be provided to the defendant and that he have an opportunity to review the videotape at 1:00 p.m. that day.  The trial court stated that, if necessary, it would continue the trial at that time to allow the defendant to view the videotape.

Although the defendant was entitled to view the videotape before trial, we conclude that he has failed to show how the outcome would have been different had he been given such an opportunity.  He contends that he could have questioned the credibility of Cindy Mason, and he avers that Ms. Mason's testimony was the centerpiece of the state's proof, aside from the victim.  Specifically, he argues that Ms. Mason testified that the defendant was in the store a little before 8:00 p.m. and then again a little before 9:00 p.m.  He contends that Ruth Hunter's testimony that she saw

21

the defendant on the videotape only once, at a little before 9:00 p.m., contradicts Ms. Mason's testimony. We fail to see how the testimony is contradictory. The fact that Ms. Hunter only saw the defendant on the videotape once does not necessarily mean that he was not in the store. In addition, any inconsistencies between the testimony of Ms. Hunter and Ms. Mason would have been obvious to the jury. These facts, combined with the other evidence, lead us to conclude that the defendant has failed to show that he was prejudiced by the denial of access to the videotape until the day of trial.

## B. PHOTOGRAPHS OF VICTIM

The defendant also complains that the state failed to disclose photographs of the victim taken at the hospital after the offense. The photographs reveal bruising on the victim's neck and lower back. The defendant claims that he did not have access to the photographs until the morning of trial. He sought a continuance that morning because he wanted an expert to review the photographs to determine the age of the bruises. However, the Motion for a Continuance was denied.

Initially, the state contends that the defendant has waived this issue because he failed to object at trial and failed to raise the issue in his Motion for a New Trial. However, the record reveals that the defendant requested a continuance once he learned of the photographs, and in his Motion for a New Trial, he argued that the trial court erred by denying his Motion for a Continuance. We will review the issue.

The state's response to the defendant's Motion for Discovery, filed November 29, 1995, states that it was "in possession of various photos of the victim." Thus, the defendant had ample pretrial notice of the existence of the photographs. However, the defendant argues that he tried to view the photographs the week before trial, but he was denied access by Detective Coulon. While we in no way condone the denial of access to the photographs, we fail to see how access would have rendered a

22

reasonable probability that the results of the trial would have been different. The defendant sought to seek expert review of the photographs purportedly to determine whether the bruises were fresh. However, the age of the victim's bruises holds little significance in light of the fact that the basis of the aggravated kidnapping and attempted aggravated rape convictions was the defendant's use of a deadly weapon, not serious bodily injury to the victim, and there was no question that the victim was attacked. We fail to see prejudice to the defendant.

## C. FINGERPRINT ANALYSIS

Finally, the defendant argues that the state failed to disclose the results of a fingerprint analysis of the victim's car until trial. The state makes no argument in response. In his request for discovery, the defendant asked that the state provide all results of scientific tests or experiments, and the state responded that it did not possess any such items. However, at trial, Detective Coulon testified that a fingerprint analysis of the victim's car was performed, but no identifiable prints were discovered. The state had an obligation to disclose such information to the defendant. In any event, the existence and results of the analysis were disclosed to the defendant during trial, and the defendant had an opportunity to cross-examine Detective Coulon about them. The defendant has failed to show how he was prejudiced by the delayed disclosure.

## IV. FAILURE TO INVESTIGATE

The defendant argues that he was denied due process because the police did not adequately investigate the case. He contends that the police did not ask the victim to participate in voice-identification, that they stopped investigating once they arrested the defendant, that they did not try to obtain hair from the victim's car, that they did not inspect the defendant's body for wounds, that they searched for the knife only briefly, and that they did not look for fragments of skin or clothing on the fence. He argues that the failure to perform all of these tasks, combined with the victim's precarious identification, denied him due process under both the United States and Tennessee Constitutions. The state contends that the police adequately investigated the case and that the defendant is implicitly arguing that the officers used false evidence to convict him.

Initially, we note that the defendant's failure to raise the issue in his Motion for a New Trial bars our review of the issue short of the record reflecting plain error. T.R.A.P. 3(e); T.R.A.P. 52(b). No such error exists. Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process.

## V. EVIDENCE OF DEFENDANT'S CRIMINAL RECORD

The defendant argues that the trial court erred by allowing the state to question his stepmother, Helen Smith, regarding his previous criminal charges. He contends that the questioning was improper and prejudicial, in light of the fact that the trial court had already granted a Motion in Limine to limit the use of the defendant's record. He also argues that he was denied the right to a fair trial because the state did not disclose before trial the defendant's criminal record, as he requested. The state

argues that the defendant opened the door to the introduction of the evidence by asking Helen Smith if she thought the defendant could have committed the crimes.

At the end of her direct examination, Helen Smith testified, upon questioning by the defendant's attorney, that she did not believe that the defendant was capable of committing the offenses. On cross-examination, she stated that the defendant was good-natured and that he had a heart. The state sought to question Ms. Smith regarding whether she knew the defendant when he was arrested twice in 1987 for assault, in 1991 for assault and aggravated assault, and in 1995 for a drug offense and whether these charges factored into her opinion. The defendant objected, and following a jury-out hearing, the trial court overruled the objection, finding that the state could test the witness' opinion of the defendant's character. We believe that the trial court properly allowed the questioning under Rule 405(a), Tenn. R. Evid. The trial court complied with the procedures of the rule and instructed the jury that the testimony was not to be considered as substantive evidence but only to test Ms. Smith's knowledge of the defendant's character.

The defendant claims that he was denied the right to a fair trial because the state failed to produce his criminal record prior to trial, as he requested. Rule 16 (a)(1)(B), Tenn. R. Crim. P., requires, in pertinent part, that the state furnish the defendant a copy of the defendant's prior criminal record that is within the possession, custody, or control of the state. The defendant filed a discovery request pursuant to this rule, and the state responded that it did not have any such information. Obviously, the state was in possession of the defendant's record because it used the defendant's previous arrests at trial to question Ms. Smith's opinion. However, we do not believe that the state's failure to disclose this information resulted in an unfair trial. The state did not attempt to introduce this evidence as part of its proof, but only used the evidence to test the credibility of Ms. Smith's opinion. Also, the trial court gave the jury

25

a cautionary instruction in this regard. In addition, the defendant's attorney stated at the jury-out hearing that he was aware of some of the defendant's criminal record. The fact that the defendant's attorney sought to limit the use of his prior criminal record in a Motion in Limine filed December 5, 1995, presupposes that he had some indication that the defendant had a criminal record. Under these circumstances, we conclude that the defendant was not denied a fair trial.

## VI. SENTENCING

The defendant contends that the trial court erred in sentencing by failing to apply mitigating factors. Specifically, the defendant argues that the trial court should have considered in mitigation the fact that he voluntarily released the victim, the fact that the victim suffered no serious bodily injury, the fact that there was no physical proof that the offense was aggravated, and the fact that he had no prior felony convictions. The state argues that the defendant was properly sentenced.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."

26

State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1995).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The presumptive sentence for a Class B felony is the minimum sentence in the range if there are no enhancement or mitigating factors. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Before sentencing, the defendant filed a motion to be sentenced as an especially mitigated offender. At the sentencing hearing, a presentence report was admitted into evidence. It reflects that the then twenty-six-year-old defendant dropped

27

out of high school in the ninth grade and had no further vocational or educational training. The report reflects that the defendant had no history of drug or alcohol abuse, although he did experiment with marijuana at age fourteen. The report reflects that the defendant is in fair physical health and excellent mental health. It reflects that the defendant was convicted of driving with a revoked license in 1991 and in 1989, assault in 1988, and disturbing the peace and assault in 1987.

The trial court applied the following enhancement factors, as listed in T.C.A. § 40-35-114:

> (7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement;
>
> (10) The defendant had no hesitation about committing an offense when the risk to human life was high; and
>
> (16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

The trial court applied in mitigation the fact that the defendant had no prior felony convictions. T.C.A. § 40-35-113(13).

First, the defendant contends that the trial court erred by not applying in mitigation the fact that he voluntarily released the victim. See T.C.A. § 39-13-304(b)(2). The trial court determined that "if the car hadn't driven up we would have been trying something very much more serious here than what we are trying." We conclude that the trial court's decision not to apply voluntary release as a mitigating factor was justified.

Next, the defendant argues that the trial court should have considered the fact that the victim did not suffer serious bodily injury. See T.C.A. § 40-35-113(1). The trial court stated that "to take a lady out there and rip her clothes off and throw her down in the mud and then she has to go several miles distance in almost a nude condition to get some help, it may not be serious bodily injury but it's certainly injury." Thus, the

28

record indicates that the trial court did not apply this factor in mitigation because the victim suffered bodily injury. This is not what the statute requires; the injury must be serious bodily injury. Nevertheless, we believe that the factor is not applicable because the defendant's actions in holding a knife to the victim throughout the ordeal show that his conduct threatened serious bodily injury, thus precluding the application of mitigating factor (1).

The defendant also argues that the trial court should have considered in mitigation the fact that there was no physical proof that the offense was aggravated. The defendant does not articulate to which offense he is referring. Also, he does not explain what he means when he says that there was no physical proof that the offense was aggravated. Because we cannot discern the defendant's argument from his cursory statement, and it is not supported by any authority, as required by T.R.A.P. 27(a)(7), we must conclude that the defendant has not shown that it should result in mitigation.

Finally, the defendant argues that the trial court should have considered the fact that he had no prior felony convictions. See T.C.A. § 40-35-113(13). The record reveals that the trial court did apply this in mitigation. We conclude that a mid-range sentence of ten years for each conviction was proper.

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
Joseph M. Tipton, Judge

29

CONCUR:

_____
David H. Welles, Judge


_____
Joe G. Riley, Judge