IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 19, 2005

## STATE OF TENNESSEE v. DARRELL TOOMES

**Appeal from the Circuit Court for Lauderdale County
No. 7561     Joseph H. Walker, III, Judge**

———————————————

**No. W2004-01739-CCA-R3-CD   -   Filed June 27, 2005**

———————————————

A Lauderdale County Circuit Court jury convicted the defendant, Darrell Toomes, of robbery, a Class C felony. The trial court sentenced him as a Range I, standard offender to five years in the Department of Correction. On appeal, the defendant contends (1) that the evidence is insufficient to convict him as the perpetrator, (2) that the trial court erred by denying his motion to suppress evidence relating to a photograph array and a subsequent in-court identification of him, and (3) that his sentence is excessive. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Gary F. Antrican, District Public Defender, and Julie K. Pillow, Assistant Public Defender, for the appellant, Darrell Toomes.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey Anne Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the snatching of a purse from Mary Russell, an eighty-five-year-old woman. Martha Rudd, the victim's sister and also eighty-five years old, testified that at 11:00 or 11:15 a.m. on March 28, 2003, she and the victim returned to their home in Ripley, Tennessee, after she drove the victim to see her doctor for a routine eye examination. She said that shortly after they drove the car into the garage, a man appeared at the passenger's side door where the victim was sitting. She said that as they got out of the car, the defendant asked them if he could mow their lawn. She said that they told him no but that he followed them out of the garage and asked the victim, "Who owns all of this?" She said that the victim replied, "We do," and that the defendant then asked the whereabouts of the victim's husband but that she did not answer him. She said the defendant

continued to follow them as they walked approximately forty feet to the back door of the house where he snatched the victim's purse. She said she was unlocking the door when she heard the victim scream. She said she turned around to see the defendant running across the yard with the purse and heading toward the street. She said she called the police.

Ms. Rudd testified that she stood face to face with the man who took her sister's purse and that she got a good look at him. She said he was wearing a grey jogging suit with a hood which was pulled up and covered his hair but not his face. She said she described him to the police as a slim, light-colored African-American man, about five feet and four inches tall. During her testimony, she positively identified the defendant as the man who took the victim's purse. She said that she also saw the defendant in general sessions court in September 2003, a few months after the robbery, and that she identified him on that day as the perpetrator.

On cross-examination, Ms. Rudd acknowledged that she occasionally wore glasses to read. She conceded that the conversation with the defendant on the day of the robbery did not last long and admitted that the victim and the defendant walked behind her as they approached the back door. She acknowledged not seeing the defendant take the purse. She said that she had her back to him as she unlocked the door and that she only turned around when the victim screamed. She said, however, that she saw the defendant running away with the purse. She said she had not seen the defendant before that day. She acknowledged that she was face to face with the defendant only while in the garage and said that the garage has an inside light which turns on automatically when the door is opened. She said that she and the victim looked at the photographs the detective brought to their house and that she picked one which showed the man who robbed her sister. She said the victim could not decide between two photographs. Defense counsel showed her the photograph array she was shown previously by the detective, and she acknowledged she had chosen photograph number three, which was not a picture of the defendant but of his twin brother, Terrell Toomes.

Ripley Police Officer Jimmy Drake testified that he responded to the robbery call at the victim's house and that a patrol car was already there when he arrived approximately three minutes later. He said he drove toward Elm Street, the direction the suspect reportedly ran. He said he arrived at Elm Street about one minute later and saw a man whose appearance was consistent with the description of the robbery suspect: an African-American male, slender build, five feet four inches to five feet six inches tall, and wearing a grey jogging suit. He said the suspect emerged from behind a house, looked to the right, and fled upon seeing him. He said he chased the suspect through some yards, behind a house, and into the woods where he lost sight of him. He said that the suspect had looked directly at him and that he recognized him as one of the Toomes brothers. He identified the defendant in court as the man he chased and said that he knew him from previous dealings and conversations he has had with the Toomes brothers during the past ten years. He admitted that the defendant and his brother look very similar and that he has had difficulty telling them apart. He testified that after he lost sight of the defendant, he and Investigator Jordan began searching the area between the victim's house and Elm Street and that they discovered the victim's purse along with some of its contents.

On cross-examination, Officer Drake acknowledged that he and the defendant looked at each other for only a second or two and admitted that his patrol car was moving at the time. He said the defendant was fifty to seventy-five feet away when he first saw him.

Mary Russell, the victim, testified that she had an appointment with an ophthalmologist on March 28, 2003, and that he dilated her eyes during the examination. She said that Ms. Rudd drove her to the appointment and that they returned home at about 11:00 or 11:15 a.m. She said that they parked in the garage and that as they were preparing to get out of the car, an African-American man approached her. She said that he asked her if she needed her yard mowed and that she told him they already had someone to do that. She said that Ms. Rudd walked around the car and that they both headed toward the house. She said that the defendant walked with them and asked if they owned the yard and that she replied yes. She said that the defendant then inquired as to the whereabouts of her husband but that she did not respond. She said that she asked him what he wanted and that he replied, "ten dollars." She said that the defendant was beside her while they walked and that Ms. Rudd was in front of them. She said that when Ms. Rudd reached the back door to their house, the defendant suddenly grabbed her purse and she screamed. She said that she was carrying the purse on her arm and that she tried to grab it from him but that he ran with the purse toward Elm Street. She said she was frightened by the incident. She said that she yelled, "He's got my purse," and that Ms. Rudd called the police. She said that a police officer arrived immediately thereafter and that her purse and its contents were recovered, except for five or six dollars. She identified the defendant in court as the man who grabbed her purse.

On cross-examination, the victim testified that she and the defendant were face to face and that they talked for only a few minutes before he took her purse. She said that she had not seen him before that day and acknowledged that Officer Jordan brought photographs for her and Ms. Rudd to examine. Defense counsel showed her the same photograph array and she recalled choosing numbers three and five. She said she was confused that day but she was certain the man who took her purse was the man in photograph three. During redirect examination, she said that she did not fall down when the defendant took her purse but that she "grabbed to try to keep from it." The prosecutor asked her if the defendant used force to take the purse and she replied, "Yes, he got it. It was on my arm, and he grabbed it off me, and I tried to take the other hand to keep it, but, you know, of course, he was stronger than I am."

Warden Glenn Turner testified that Terrell Toomes, the defendant's twin brother, was imprisoned on March 27, 2001, and at the time of trial was still incarcerated at the Hardeman County Correctional Facility. He said that according to the prison's records, Terrell Toomes did not leave the facility for any reason and was in prison on March 28, 2003, the day the crime was committed.

Ripley Police Investigator Terry Jordan testified that he responded to the robbery call received from the victim, talked with the victim and her sister, and then left the scene to meet with Officer Drake who had reported seeing a person fitting the description of the robbery suspect. He said he subsequently constructed a photograph array which contained photographs of both Toomes brothers. He said that he had known the Toomes brothers for ten years and that they looked alike.

-3-

He said he located the defendant about one week later and asked him to come to the police department to talk with him. He said the defendant agreed to meet him but did not show up. He said he searched for him for several weeks but was unable to find him. He said he learned during the investigation that the defendant's twin brother was incarcerated at the time of the crime. He said the victim and her sister attended one of the general sessions court hearings related to the case. He said they motioned to him when they exited the courtroom and informed him that the man who snatched the purse was inside the courtroom. He said they identified the defendant as the robber.

On cross-examination, Investigator Jordan identified the photographs he had shown the victim and her sister. He admitted that neither woman was able to identify the perpetrator positively from the photographs. He explained that one of them said the robber looked like the man in photograph three, that the other said he looked like the man in number three and number five, but that neither woman was one hundred percent certain that the robber was the man in either photograph. He acknowledged that the man in photograph three was Terrell Toomes and that the defendant was the man in photograph six. He did not recall the name of the man in photograph five. He said he attempted to locate this man but was unsuccessful. He acknowledged that the defendant's photograph was not selected by the victim or her sister and that he did not send the victim's purse or its contents to the crime lab for fingerprint analysis.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to prove beyond a reasonable doubt that he was the person who committed the robbery. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not re-weigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401. Viewing the evidence presented at trial in the light most favorable to the prosecution, we conclude that a rational juror could have found beyond a reasonable doubt that the defendant was guilty of robbery. The two eyewitnesses identified the defendant as the man who grabbed the victim's purse off Ms. Russell's arm. He fled, but within a matter of minutes, Officer Drake saw the defendant in the direction the suspect was reported to have run. Although he was not apprehended that day, the purse and its contents were recovered in the area between where the defendant was seen and where the crime was committed. The defendant is not entitled to relief on this issue.

## II. MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress evidence relating to the photographs and by allowing the subsequent in-court identification of the defendant. He asserts that the pretrial confrontation was invalid and the use of this evidence caused an irreparable misidentification in his case which violated his constitutional rights to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The state responds the trial court found that the evidence relating to the photographs did not create the likelihood of an irreparable misidentification and that the jury would determine whether identification was proven. The state asserts that the evidence does not preponderate against the trial court's ruling.

At the suppression hearing, the victim testified that a week or two after the robbery, Investigator Jordan brought photographs for her and Ms. Rudd to examine at her home. She denied that he pointed to any specific person and explained that he merely handed them photographs to look at to see if they recognized the person who took the purse. She said she believed the man in photograph number five was the robber.

On cross-examination, defense counsel asked the victim if she was testifying that the person in photograph number five took her purse, and she responded, "I think that is, uh-huh." Counsel then identified the man in photograph number five as Chris Taylor. The victim said that her eyes had been dilated earlier the day of the robbery but that they were normal by the time they returned home. She repeated her belief that the man in photograph number five took her purse. During redirect examination, she said she saw the perpetrator at a hearing in general sessions court. She said that she alerted Investigator Jordan and that the man she saw that day was the defendant.

Martha Rudd testified that Investigator Jordan brought photographs for her and the victim to view and that they looked at them together. She recalled that she selected number three and initially said that she did not see that person in the courtroom. On cross-examination, she was asked again about the person in photograph three and she said, "Yeah, I see him now." She said that the defendant was facing her and the victim during their conversation and that she saw him for approximately five minutes. She said that she and her sister picked the same photograph, number three, but did not recall whether they discussed the decision with each other. She estimated that they examined the photographs for thirty minutes. When reminded that the victim had selected number five, she said that her sister was "mixed up." She said she believed the defendant was the man in photograph number three. She said Investigator Jordan made no suggestions while they studied the photographs.

Officer Jimmy Drake testified essentially the same in all relevant respects as his trial testimony, except that at the hearing he said he was one hundred to one hundred fifty feet from the defendant when he identified him on Elm Street. At the trial, he estimated the distance to be fifty to seventy-five feet.

Investigator Jordan testified that the victim and her sister looked at the photographs for about ten minutes and that neither woman picked the defendant's photograph. He said he showed the victim and her sister the photographs approximately one week after the robbery. He said he did not make any indications or any suggestions to them while they viewed the photographs. The remainder of Investigator Jordan's testimony was essentially the same as his trial testimony.

Regarding whether the photograph identification was unduly suggestive, the trial court found that the two witnesses in this case had an opportunity to view the perpetrator during his commission of the crime, that they both testified concerning their degree of attention, and that they were able to give a description that was accurate with regard to physical description and the clothing worn by the suspect. The trial court concluded that the photograph viewing was not unduly suggestive, even though it was a "little bit different than normal, because neither victim identified the defendant." In any event, the trial court found no reason to suppress the evidence and concluded that identification of the defendant would be an issue for the jury. The trial court also found no reason to suppress the witness' identification of the defendant during the hearing in general sessions court. It noted that the state played no part in setting up the identification and that the witnesses merely observed the defendant in the courtroom, believed he was the man who robbed the victim, and told a police officer about it.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967 (1968), the Supreme Court discussed the potential hazards of an identification procedure involving photographs as opposed to a lineup. However, the court also recognized the use of photographs as an effective procedure "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Simmons, 390 U.S. at 384, 88 S. Ct. at 971. It concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id.; see, e.g., Sloan v. State, 584 S.W.2d 461 (Tenn. Crim. App. 1978). The Court in Simmons noted that the potential for misidentification is increased when one photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." 390 U.S. at 383, 88 S. Ct. at 971. Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and

conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Stovall v. Denno, 388 U.S. 293, 301-302, 87 S. Ct. 1967, 1972 (1967)).

We first note that the photograph array was not impermissibly suggestive. No photograph was markedly different from any other or in some way emphasized. Investigator Jordan testified he did not make any indications or suggestions to the victim or her sister while they viewed the photographs. The victim testified that Investigator Jordan did not point to any suspects during their review of the photographs, and her sister testified that he did not make any suggestions.

In arguing that the photograph identification was unreliable and should have been suppressed, the defendant points to the fact that neither the victim nor her sister identified the defendant from the photographs. The defendant contends that allowing the photograph evidence and subsequent in-court identification violated due process under the factors set forth in Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375 (1972). In Biggers, the United States Supreme Court set forth five factors to consider in evaluating the likelihood of misidentification following a suggestive lineup procedure: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. 409 U.S. at 200, 93 S. Ct. at 382. The court must consider the "totality of the circumstances" in determining whether the identification was reliable. Id. We have concluded that the photographic lineup in this case was not impermissibly suggestive. In any event, the Court stated that unnecessary suggestiveness alone does not require the exclusion of evidence. Id. It observed that "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" Id. at 199, 93 S. Ct. at 381 (quoting Simmons, 390 U.S at 384, 88 S. Ct. at 971); see also State v. Philpott, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1993). Therefore, we consider the factors set forth in Biggers.

With respect to the first factor, both witnesses had sufficient opportunity to view the man who took the purse. Although the victim had been to the eye doctor and had her eyes dilated earlier that day, she testified that her vision had returned to normal by the time they arrived home and that she was face to face with the defendant. Ms. Rudd testified that she required glasses only for reading and that the garage was equipped with a light that went on automatically when the door opened. She said she also saw the defendant face to face and for approximately five minutes.

The second factor, the witness' degree of attention at the time of the crime, also weighs in favor of finding the in-court identification reliable. The defendant surprised the women by appearing at the door of their car as they pulled into their garage and asked them numerous questions, which they answered while talking with him face to face.

Regarding the third factor, we note that the witness' description of the robbery suspect, an African-American male, slender build, five feet four inches to five feet six inches tall, and wearing

a grey jogging suit, was sufficiently detailed and accurate. Officer Drake testified that he saw the defendant who met the description approximately one minute after receiving the description.

Regarding the fourth factor, the certainty of the witnesses at the confrontation, we recognize that eyewitness identification is fallible. See State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995). In this case, neither witness was able to pick the defendant from the photographs. Although both witnesses selected a photograph of the defendant's twin brother from the array presented to them, the victim selected the defendant's brother as merely one of two possibilities. We note that both witnesses told Investigator Jordan that they had identified the man who snatched the victim's purse during a hearing in general sessions court in September 2003. Although the vagaries of eyewitness testimony are substantial, the credibility of witnesses is an issue for the jury. After hearing evidence of the witnesses' inability to pick the defendant from the photographs, the jury ultimately resolved the identification issue in favor of the state.

With respect to the fifth factor, the length of time between the crime and confrontation, the record reflects that both witnesses viewed the photographs approximately one week after the robbery. This factor warrants little weight, however, because neither witness made a positive identification of the defendant at that time.

Considering the factors provided in Biggers and the totality of the circumstances, we conclude that admitting the evidence relating to the photographs did not give rise to a substantial likelihood of irreparable misidentification. We also believe that the in-court identification was sufficiently reliable for due process purposes. The witnesses' opportunity to view the perpetrator, degree of attention, and accurate description outweigh the fact that they did not select the defendant while viewing the photographs. As previously noted, both witnesses picked a photograph of the defendant's twin brother, although the victim chose him as one of two possibilities, and both positively identified the defendant when they saw him in general sessions court. The defendant's right to due process was not violated.

### III. SENTENCING

The defendant contends that the trial court erred by applying enhancement factors that were improper given the facts of the case. He asserts that his sentence is excessive and that the trial court erred by violating the principles set forth in T.C.A. § 40-35-103. The state contends that the trial court properly sentenced the defendant. We agree with the state.

At the sentencing hearing, Darrell Smothers testified that he prepared the defendant's presentence report. He said he interviewed the victim who informed him that the robbery was a traumatic event for her and that she had suffered from health problems related to the incident. He said that his investigation revealed the defendant had a conviction for attempted aggravated burglary on March 22, 2002, for which he was sentenced to thirty months on probation. He said the probation was revoked on September 16, 2003, and at that time the defendant was serving the remainder of the sentence in the Department of Correction. He said the defendant's criminal record also contained

convictions for casual exchange of marijuana in May 2001, facilitation of aggravated burglary in January 2003, and criminal trespass in August 2003. Investigator Jordan testified that during his investigation of the robbery, he learned the defendant had fled to Tipton County and was incarcerated for approximately forty days on a criminal trespass charge, which had been reduced from a charge of automobile burglary.

After hearing the witnesses' testimony and considering the presentence report, the trial court addressed the enhancement factors listed in T.C.A. § 40-35-114 and applied factor (2), that the defendant had a previous history of criminal convictions, based on the defendant's two prior felony convictions and the two prior misdemeanor convictions; (5), that the victim was particularly vulnerable because of age; (9), that the defendant had a previous history of unwillingness to comply with conditions of sentencing involving release into the community, based on proof of probation violations in both Circuit and Juvenile courts; (14), that the defendant committed the instant felony while on probation; and (21), that the defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult, i.e., burglary and aggravated burglary. In mitigation, the trial court found that the defendant's criminal conduct neither caused nor threatened serious bodily harm. T.C.A. § 40-35-113(1). Based upon the existence of these enhancement and mitigating factors, the trial court sentenced the defendant to serve five years. The trial court also ordered that the sentence run consecutively to the previously imposed sentence he was serving for attempted aggravated burglary because of the defendant's extensive record of criminal activity and the fact that he committed the robbery while on probation. T.C.A. § 40-35-115(2), (6).

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The range of punishment for a Range I defendant is not less than three nor more than six years for a Class C felony. T.C.A. § 40-35-112(a)(3). Unless there are enhancement factors present, the presumptive sentence to be imposed is the minimum sentence in the range. T.C.A. § 40-35-210(c). Our sentencing act provides that procedurally, the trial court is to increase the sentence within the range based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Initially, we note the trial court complied with the purposes, principles, and procedures of the 1989 Sentencing Act. Therefore, we review the defendant's sentence de novo with a presumption of correctness. The defendant argues that the trial court ignored the purposes and principles set forth in T.C.A. § 40-35-103 and the Sentencing Reform Act when it imposed his sentence and that his sentence is far greater than he deserves given the offense committed. However, he presents no facts or legal authority to demonstrate how the trial court erred. Our review of the record fails to show that the trial court erred or that it's application of the five statutory enhancement factors was not properly supported by the evidence. We conclude that the defendant's sentence is proper.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE